Pee Curiam:
This case was referred to Trial Commissioner Joseph V. Colaianni with directions to prepare and file his opinion on the issues of plaintiff’s motion and defendant’s cross-motion for summary judgment under the order of reference and Buie 166(c). The commissioner has done so in *506 an opinion and report filed on March. 10, 1971, Avherein such facts as are necessary to the opinion are set forth. A request for review of the commissioner’s opinion and recommendations was filed by plaintiff, defendant urged the court to adopt the commissioner’s opinion and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion and recommended conclusions of the trial commissioner, it hereby adopts the same as hereinafter set forth as the basis for its judgment in this case. Therefore, as to Claims I and III plaintiff’s motion for summary judgment is denied, defendant’s cross-motion is granted and the petition is dismissed. As to Claim II, with respect to the painting of one stairway and certain N.I.C. areas, plaintiff’s motion for summary judgment is granted and defendant’s cross-motion is denied. Further proceedings as to this claim are stayed pursuant to Buie 167 for a period of 90 days to afford the parties an opportunity to obtain an agency resolution of the amount of equitable adjustment to which plaintiff is entitled.
OPINION OP COMMISSIONER
Colaianni, Commissioner: Plaintiff’s claims arise out of a January 12, 1965, contract with the Corps of Engineers for the repair of earthquake caused damage to a hospital at Elmendorf Air Force Base in Alaska. The claims are made and presented for and on behalf of Warren Painting Company Inc. of Anchorage, Alaska, plaintiff’s subcontractor.

BacJegrovmd Facts

On March 27, 1964, portions of Alaska were heavily damaged by a severe earthquake. The multi-story, 400-bed Air Force Base Hospital, outside of Anchorage, Alaska, was among the buildings that suffered extensive damage. The damage was of such a nature and severity that it was necessary to completely deactivate the hospital.
To enable repairs to be made to the hospital, and other Alaskan facilities, emergency funds were made available by the United States Government pursuant to Title 42 U.S.C. § 1855e. Because of the necessity that the hospital be re *507 activated as quickly as possible, a th.ree-pb.ase repair and restoration program, under the auspices of the Alaska District of the Corps of Engineers, United States Army Engineers, was decided upon.
A contract to conduct Phase I repair and restoration work was negotiated between the United States Army Corps of Engineers and M-B Contracting Company. The Phase I work concentrated on the critical areas that needed immediate attention to enable the most basic of hospital services to be performed. The work on Phase I commenced shortly after the earthquake and continued through May 15,1964.
The Phase II repair and restoration contract was also awarded to M-B Contracting Company, and work under this contract commenced immediately after termination of Phase I work and continued until late December 1964. The repair and restoration work under Phase II also concentrated on the more essential and critical areas of the hospital.
The emergency repairs conducted during Phases I and II were not only generally limited to the most critical of areas in the hospital, but were also substantially of an incomplete or temporary nature.
Furthermore, while the Phase I and II contracts were primarily concerned with structural type repairs, the testimony shows that painting to select areas also occurred. There is no dispute that during April and early May 1964, clinical laboratory areas, obstetric delivery areas, and surgical areas were given a touch-up and one finish coat of paint. Similarly, there is no question that just prior to Christmas day 1964, during the Phase II contract, the main lobby of the hospital was painted in anticipation of holiday visitations.
The claims with which we are here concerned arose out of contract No. DA 95-507-ENC — 2070, awarded to plaintiff for interior and exterior repair and rehabilitation work to be performed during Phase III. The $1,044,786[1] contract included an estimate of $12,9,500 for the painting called for by the contract. This painting estimate was based on the low job basis bid of Warren Painting Company, Inc. (hereinafter referred to as Warren) for Item 21 of the unit price schedule. *508 In turn, Warren’s bid[2] breaks down into estimates of $113,000 for painting of tbe interior,[3] and $16,500 for painting of the exterior.
Plaintiff seeks equitable adjustments, by way of a standard “Disputes” clause in the contract, for increased costs allegedly occasioned by constructive changes.
Plaintiff originally requested a contracting officer’s decision with respect to five claims of compensation for extra painting work performed on the Elmendorf Base Hospital. Four of plaintiff’s claims were denied by the contracting officer’s decision of February 14, 1966. However, plaintiff’s fifth cause of action, which sought an equitable adjustment to the contract price for the cost of painting built-in metal cabinets, was not decided since the parties were attempting to settle it through negotiations. By way of Modification No. 49 to the contract, the parties on June 29,1966, agreed to a contract increase of $11,800.26 for painting of the prefinished items covered by plaintiff’s fifth cause of action. On appeal, the Armed Services Board of Contract Appeals (hereinafter referred to as Board) denied three of plaintiff’s remaining four claims, but sustained plaintiff’s claim of $35,092.45 for extra labor and material costs incurred for stippling of interior walls and ceilings.[4]
Plaintiff seeks review of the Board’s adverse determina tions, urging that the Board committed reversible error» both in its findings of fact and conclusions of law. 3h this instance, the issues are presented by cross-motions for summary judgment and must be resolved in accordance with Wunderlich Act standards.[5]
The separate and distinct claims for equitable adjustments which plaintiff wants this court to review are:
(I) The Board’s determination that the application of a *509 fill-coat and finish, coat on the entire building exterior was a contract requirement;
(II) The Board’s determination that additional work on the interior of the building was a contract requirement; and
(III) The Board’s factual determination that plaintiff was not subjected to excessive workmanship standards.
The basis for each of plaintiff’s claims is the “Changes” clause of the contract. The Board in denying each of the above listed claims, held that the work required of plaintiff, to both the interior and exterior, was clearly called for by the contract, and that the standards of the workmanship to which plaintiff’s subcontractor was held did not substantially exceed those warranted by the contract.
Each of plaintiff’s three claims are herein discussed separately.
CLAIM I

Contract Requirements Relating to Exterior Concrete and Masonry Surfaces

The exterior of the multi-floor Elmendorf Hospital was constructed of steel reinforced monolithic concrete columns and beams and concrete masonry units of monolithic concrete or concrete blocks. The concrete columns and beams sustained extensive damage ranging from gaping fissures to thousands of lineal feet of hairline cracks. Similarly the concrete masonry units were also extensively damaged. Numerous panels had to be replaced either partially or in their entirety, and substantially all were damaged by cracks.
From the outset the parties did not agree that the contract required the subcontractor to apply a cement-latex-filler coat and one final coat to the entire exterior of the hospital. Based on a multipronged argument, plaintiff contends that a latex-filler coat, the surface preparation, and a final finish coat were to be applied only to those exterior surfaces of the hospital which were repaired.[6]
*510 On the other hand, defendant contends that the contract required the application of a latex-filler coat surface preparation to the entire hospital exterior. Defendant also contends, that the contract required the application of a finish coat of paint to the entire hospital exterior.
At the root of this cause of action is the familiar question of interpretation of contract specifications. This court has over the years consistently held the interpretation of contract specifications to be a question of law. Accordingly, the Board’s prior decision is not entitled to finality,[7] but is open to judicial review by this court.[8] The contract provisions considered by the parties and the Board as being most relevant to this cause of action are embodied in Section 10 of the Technical Provisions.
Paragraph 10-01 “SCOPEprovides:
This section covers the painting for building construction that is itemized hereinafter under SUB-FACES TO BE PAINTED and that is not specified in other sections.
The portion of paragraph 10-066. “CLEANING- AND PBEPAEATION OF SURFACESwhich is pertinent to the question now being considered provides:
Concrete a/nd masonry surfaces to be painted shall be prepared by removing * * * old weathered paint, and by roughening to remove glaze. * * * Cement-latex filler coat shall be applied to all exterior concrete and masonry surfaces.
In pertinent part, paragraph 10-08 “SURFACES TO BE PAINTEDprovides as follows:
a. General: Except as specified under SURFACES NOT TO BE PAINTED, all existing and new surfaces shall be painted. Existing surfaces shall be cleaned of all dirt, grease, etc, and shall be painted one coat of the final coat of paint required in the Painting Schedule for the particular surface. Existing and new unpainted surfaces to be painted, shall receive the surface preparation *511 and treatment and the number and types of coatings specified. * * *
$ # $ * *

b. Painting Schedule:

* * * * #
Finally, paragraph 10-09 “SURFACES NOT TO BE PAINTEDlists the surfaces of the hospital exterior which were excepted from the contract painting requirements, and provides in pertinent part:

a. Exterior Surfaces:

(11 Concrete walking surf aces
(2) Aluminum
* >;« $ * *
Basic to plaintiff’s position concerning the painting work required by the contract, is its emphasis that we are concerned with a contract which is fundamentally dedicated to the repair of the Elmendorf Hospital. In support of its position, plaintiff points out that the contract was funded from federal emergency appropriations authorized by Title 42 U.S.C. § 1855e. With the above as its foundation, plaintiff unconvincingly argues that the areas to be painted must bear some relationship to the need for repairs. This is necessary, plaintiff contends, since there was no expectation or intent that anything should be done to undamaged and previously repaired surfaces, for by definition one cannot repair that which is not damaged.
These contentions by plaintiff have the unconvincing ring of typical “hindsight” or “after thought” type arguments, conceived long after the contract with which we were concerned was executed, and appear to have no foundation in fact.
Equally unmeritorious was plaintiff’s argument that the drawings were the only portion of the contract that indicated *512 “where to paint,” and the specifications, on the other hand, disclose “how to paint.”
We agree with the conclusion reached by the Board which summarily dismissed this argument with the following statement (67-2 BOA ¶ 6568, p. 30,475):
It is true that generally speaking this is a contract for repairs and one of the work items is painting and in that sense painting is an item of repair. The drawings, however, on which so much reliance is placed, do not purport to show where THAT work is to be done although they show in great detail where other work is to be done. * * *
* * * ❖ >}*
Further underscoring the weakness of plaintiff’s argument are the following contract examples where the work requirements are shown in the drawings:
(1) SECTION 14 BITUMINOUS PRIME COAT; paragraph 14-02A “EXISTING PAVEMENT:” Existing pavement shall be removed, as shown in the contract drawings. * * * [Emphasis added.]
(2) SECTION 1 CONCRETE; paragraph 1-04 “REMOVAL WORK:” Existing concrete shall be removed where indicated on the drawings. * * * [Emphasis added.]
(3) SECTION 6 LUMBER AND INSULATION; paragraph 6-075. Installation: Lumber shall be installed wherever existing lumber is required to be removed. Installation shall conform to the details indicated on the drawings. [Emphasis added.]
Contrasting these examples with the language of TP 10-01, we have no doubt that the specifications and not the drawings were intended to tell the contractor “where to paint” as well as “how to paint.”
In a considerably more substantial argument, plaintiff points out that the Board conceded that “This record does furnish support for the appellant’s contention that a filler coat is intended to fill voids in new masonry and is inappropriate for painted surfaces * * [9] Accordingly, plaintiff argues that unless its interpretation of the contract is followed, it will be forced to perform a useless and needless *513 task. Albeit for reasons importantly different from those of the Board, we conclude, as did the Board, that the contract specifications required the application of a latex-filler coat and a finish coat to the entire exterior of the hospital. The basis for our conclusion follows.
The Government, with whom the Board agreed, pointed out that TP 10-08®. required the application of the filler coat to all exterior concrete and masonry surfaces. The Board, in support of this interpretation, relied upon the last sentence of Technical Provision 10-065., which provides:
* * * Cement-latex filler coat shall be applied to all exterior concrete and masonry surfaces.
After a reading of TP 10-08®., we agree with the Board’s observation that it lacks artistry in its expression. However, even more important, a reading of TP 10-08®. and the last sentence of TP 10-065., highlights the existence of a serious inconsistency on the face of the contract. The second sentence of TP 10-08®. requires the application of one coat of the final coat of paint to all existing surfaces. Yet, the very next sentence of that same provision requires that existing surfaces and new unpainted surfaces to be painted shall receive the surface preparation and number of coats specified in TP 10-085. If Technical Provision 10-08®. is to be internally consistent, either the existing surfaces spoken of in the two sentences are different, or the existing surfaces are the same and the number of coats specified, which is the language of sentence three, refers to the specific requirement in sentence two that these surfaces are only to receive one final coat of paint.
A review of the contract precludes the possibility that the term “existing surfaces” in these two sentences refers to different surfaces. Therefore, the only reasonable interpretation is the latter one. However, this analysis necessarily leads to the unavoidable and clear conclusion that TP 10-08®. is in direct conflict with the last sentence of TP 10-065., which requires the application of a filler coat to the entire hospital exterior. We thus cannot agree with the Board’s characterization that TP 10-08®. is merely redundant, but rather are *514 forced to conclude that it is clearly ambiguous when read in light of TP 10-065.
The rule has long been established that a provision in a contract which is unclear, and capable of being interpreted in at least two reasonable ways, is ambiguous. Sun Shipbuilding and Dry Dock Co. v. United States, 183 Ct. Cl. 358, 372, 393 F. 2d 807, 815-816 (1968) ; Bennett v. United States, 178 Ct. Cl. 61, 64, 371 F. 2d 859, 861 (1967).
When Technical Provision 10-08<z. is read, as plaintiff urges us to do, with an eye on the purpose of the entire contract, and by also taking into consideration the questionable use of a surface preparation over previously painted surfaces, plaintiff’s interpretation of the contract is reasonable. On the other hand, defendant’s interpretation avoids a direct conflict between TP 10-08a. and TP 10-065., and, at the same time, agrees with the interpretation of at least one of plaintiff’s own witnesses. Therefore, defendant’s interpretation is also a reasonable one. Hence, we conclude that a substantial and reasonable ambiguity exists in this contract.[10]
Ordinarily, if an ambiguity cannot be cleared up by reading the contract as a whole or looking to the circumstances attending the transaction and the conduct of the parties, the ambiguity should be resolved against the party who drafted the contract.[11] However, we have in the past cautioned against resolving an ambiguity against the drafter of the contract if the ambiguity is so patent and glaring that the contractor was obligated to seek clarification. See J. A. Jones Constr. Co. v. United States, 184 Ct. Cl. 1, 11-13, 395 F. 2d 783, 789-790 (1968). See also Jefferson Constr. Co. v. United States, 176 Ct. Cl. 1363, 364 F. 2d 420 (1966), where this court went beyond a more finding of ambiguity in a contract, and considered if a contractor has in certain circumstances a duty to seek clarification of interpretative problems. In concluding that the contractor is in some in *515 stances under sucb a duty, we stated at pages 1368-69, 364 F. 2d at 423:
* * * While ambiguous contract provisions are construed against the author (Peter Kiewit Sons' Co. v. United States, 109 Ct. Cl. 390 (1947)), and a contractor is not usually obligated to seek clarification of all interpretative problems inhering in the contract terms, he must nevertheless inquire where the discrepancy, omission or conflict is obvious (Consolidated Eng'r Co. v. United States, 98 Ct. Cl. 256, 280 (1943) ; Jefferson Construction Co. v. United States, 151 Ct. Cl. 75, 89-91 (1960)), and most particularly so when a specification provision affirmatively warns him of such possible discrepancies in the plans (WPC Enterprises Inc. v. United States, 163 Ct. Cl. 1, 6, 323 F. 2d 874, 876 (1963), and collated authorities), or where a contract article requires him to submit detected discrepancies to the contracting officer for decision (Beacon Construction Co. v. United States, 161 Ct. Cl. 1, 6, 314 F. 2d 501, 504 (1963)). * * *
In the contract at bar, the conflict between Technical Provisions 10-08ffi. and 10-066. is not what has been referred to in the past as “obscure in nature,”[12] but can be more accurately referred to as one which would have been “obvious”[13] to any reasonable contractor experienced in the painting-trade. Indeed, a concurrent reading of both TP 10-066. and TP 10-08a. underscores and spotlights the patent and glaring incompatability of the two provisions, and under these circumstances plaintiff had the burden to seek clarification of the contract ambiguity. See L. Rosenman Corp. v. United States, 182 Ct. Cl. 586, 590, 390 F. 2d 711, 713-714 (1968). We need not go on to establish if plaintiff actually knew of the obvious conflict, since it is not the actual knowledge of the contractor, but the obviousness of the discrepancy which imposes the duty of inquiry. J. A. Jones Constr. Corp. v. United States, supra.
Further warning to the plaintiff was provided by General Provision No. 2 of the contract, which cautioned: “In case of discrepancy either in figures, in the drawings, or in the *516 specifications, the matter shall be promptly submitted to the Contracting Officer * * This provision further warned that “Any adjustment by the Contractor without such a determination shall be at his own risk and expense.” In HRH Constr. Corp. v. United States, 192 Ct. Cl. 912, 920, 428 F. 2d 1267, 1272-1273 (1970), a case having striking similarity to the one at bar, this court dealt with a contract having a similar type of provision, and unhesitatingly set forth the consequences which face a contractor who chooses to proceed in the performance of a contract which contains a patent ambiguity. Particularly, this court at page 920, 428 F. 2d at 1272 stated:
Had the obvious omission timely been brought to defendant’s attention, the dispute now in litigation would have come to light, and would have been appropriately resolved prior to the submission of bids. Having bridged the gap in its own favor without consulting thepontract-ing officer prior to bidding, however, plaintiff is not entitled to recover here.
The obvious contract inconsistency concerning the application of the filler coat to either the entire hospital exterior (TP 10-065.) or only to repaired, unpainted surfaces (TP 10-08a.) was so glaring that plaintiff should have sought clarification. Having failed to inquire, plaintiff cannot now “bridge the crevasse in his own favor.” Beacon Constr. Co. v. United States, 161 Ct. Cl. 1, 314 F. 2d 501 (1963); see also J. A. Jones Constr. Co. v. United States, sufra. Accordingly, plaintiff’s claim for additional compensation for the application of the cement-latex filler, to the entire exterior concrete and masonry surfaces is denied. The decision of the Board as to its ultimate determination on this issue is affirmed.
Turning now to the second part of CLAIM I, we consider whether plaintiff was required by the contract to place a final coat of paint over the entire exterior concrete and masonry surfaces. The Board found that Technical Provision 10-08<t. was concerned with this facet of the job and its language eminently clear in its directive that “Existing surfaces * * * shall be painted one coat of the final coat of paint * * *.”We agree.
*517 Plaintiff does not argue that TP 10-08®. is unclear or in conflict with other contract provisions regarding the requirement that it put one final coat of paint over the entire hospital exterior. Eather, plaintiff argues, since the contract was one for repair of the hospital, that no painting should be required to areas which were not damaged by the earthquake. We do not feel that such an interpretation of TP 10-08®. is a reasonable one. Indeed, to do as plaintiff urges would necessitate ignoring the clear directive of TP 10-08®., and, of the contract as a whole. “Contracts are not necessarily rendered ambiguous by the mere fact that the parties disagree as to their meaning. There must be a reasonable uncertainty of meaning.” Southern Constr. Co. v. United States, supra, n. 10, 176 Ct. Cl. at 1361, 364 F. 2d at 452-453. No such uncertainty exists here. For the foregoing reason, the decision of the Board concerning the application of one coat of paint to the entire exterior of the hospital is affirmed.
CLAIM II

Contraet Requirements Relatmg to Interior of the Hospital

While the testimony is not clear as to the amount of damage caused by the earthquake to the interior of the hospital, there is no dispute that at the beginning of Phase III the hospital interior could be grouped into the following categories:
(a) areas that had been previously repainted during Phases I and II;
(b) areas that were neither damaged by the earthquake, nor repaired during Phases I, II or III;
(c) areas that had not been painted prior to the earthquake; and
(d) areas specifically excluded from the Phase III contract and designated N.I.C. (Not In Contract) on the drawings.
There also appears to be no doubt that the parties practically from the initiation of the Phase III contract were unable to agree as to the painting required thereunder to the interior of the hospital. A dispute concerning the work re *518 quired by the contract culminated in the issuance of the following directive by the contracting officer:
My decision is that you are to paint as a contract requirement all areas, surfaces, and items of the interior of the 5040th Hospital excepting areas indicated as N.I.C. (Not In Contract), and concrete walking surfaces, stairs, and platforms except those already painted, elevator shafts, new acoustical tile units, prefinished surfaces such as ceramic tile and vinyl wall covering, pipe trenches, pipe shafts, cork and asphalt tile. [Item IT, Rule 4 Documents.]
A subsequent directive ordered plaintiff’s subcontractor to paint N.R.R. (No Repairs Required) areas.[14]
As a result of these directives, and subsequent oral and written orders, plaintiff alleges that it was required to paint the entire interior of the hospital. Accordingly, plaintiff urges that its subcontractor was forced to do extra work, beyond that called for by the contract, and therefore an equitable adjustment in the contract price to compensate for the extra work is warranted. Plaintiff’s claim for an equitable adjustment has been denied by both the contracting officer and the Board.
Plaintiff in its second cause of action appeals the Board’s decision denying its claim for an equitable adjustment and urges that the Board “* * * erred in concluding that the contract required painting of the entire interior hospital structure, including previously repaired and painted areas; undamaged areas; areas that never had been previously painted; and areas specifically excluded from the contract.”
This claim, similar to CLAIM I, fundamentally arises from a conflict in the interpretation of a contract provision, and is a question of law. Accordingly, as we explained in connection with CLAIM I, the decision of the Board concerning this claim is subject to a full judicial review.[15]
We are again called upon to determine, although in a different context, the meaning of TP 10-08a. It will be re *519 called that TP 10-08a. was quoted in pertinent part herein-above, and required the painting of all new and existing surfaces except those specified under “SUBFACES NOT TO BE PAINTED.”
Technical Provision 10-09 “SUBFACES NOT TO BE PAINTED” states in pertinent part, that:
The following listed items will not require painting:
5. Interior Surfaces:
(1) Concrete walking surfaces
(2) Stairs and platforms except those already painted
(3) Elevator shafts
(4) New acoustical tile units and prefinished surfaces, such as ceramic tile, etc.
(5) Pipe trenches
(6) Pipe shafts
(7) Cork tile floors
(8) Areas scheduled on the drawings as unfinished.
We will now consider each of the areas of categories (a) through (d) individually to determine for ourselves if the Board’s rejection of plaintiff’s claim for an equitable adjustment was correct.
Category (a) Areas
Plaintiff, urges, once again, as it did in connection with CLAIM I, that the true intent and purpose of this contract can only be reached if its repair nature is not forgotten. Plaintiff contends that to the extent that the contracting officer’s directives and the Board’s decision required it to paint areas that had been previously repainted during Phase I or II, it was ordered to do work which was outside of the work requirements of the contract and therefore it is entitled to an equitable adjustment.
We, accordingly, must decide whether category (a) areas were properly found to be within the work requirements of this contract.'[16] While the actual number of rooms painted during either Phase I or II has never been clearly estab- *520 fished, the testimony does show that the following painting occurred:
(a) Phase I Painting — (In April and early May 1964)
(1) clinical laboratory areas,
(2) obstetric areas, and
(3) surgical areas.
(b) Phase II Painting — (December 1964)
(1) Main lobby of hospital
Plaintiff argues that no evidence was introduced to show that the parties intended to have areas which were painted during Phases I and II repainted during Phase III operations. Quite to the contrary, plaintiff urges, the testimony shows that certain of the previously repaired areas were deleted by defendant, without a credit being sought. Plaintiff would have us interpret this as proof positive that defendant was not contractually entitled to have these previously repainted areas worked upon once more in Phase III.
The testimony to which plaintiff refers for support of its contention, if anything, cuts the other way. As we view the testimony, the painting that was deleted was done by change orders at the hospital’s request and for its convenience.
Further, the testimony shows that since the painting of Phases I and II a considerable amount of construction work had occurred, and the previously painted areas were subjected to unusual amounts of dust and dirt. Also, since the areas that had been repainted were in most instances the only hospital areas in operation, and since the hospital was limping along under emergency conditions, these repainted areas were subjected to severe overuse. Lastly, much of the painting that was done under Phases I and II was over a year old by the time of the Phase III operation. All of these factors made the painting of those previously painted areas a necessity. We, accordingly, do not agree with plaintiff, that a Phase III painting of areas previously painted during Phases I and II amounts to the performance of a useless and wasteful act. To the contrary, we find that the painting was a necessity and these areas were intended to be repainted during Phase III.
We also note that the category (a) areas come within the terms of TP 10-08®., and since they cannot reasonably be classified under any of the exceptions of TP 10-095., or as *521 N.I.C. areas, we are all the more convinced of plaintiff’s obligation to paint them during Phase III.
Category (b) Areas
We now turn our attention to those areas of the hospital interior that were neither damaged in the earthquake, nor repaired under either of the earlier Phase I or II contracts or under the Phase III contract involved in this action. Plaintiff argues that these areas have no causal relationship to the earthquake, and are clearly beyond the repair purpose of the Phase III contract. Further, plaintiff urges that these undamaged areas are obviously not related to the purpose for which emergency funds are made available by Title 42 U.S.C. § 1855e.
The Board was unconvinced for it quickly disposed of plaintiff’s claim by merely referring back to its comments for rejecting plaintiff’s claim for compensation for exterior painting. We believe that plaintiff’s claim for an equitable adjustment for painting category (b) areas requires a more thorough treatment. However, we should say that plaintiff’s arguments fail to convince us that the category (b) areas were intended as a whole not to be covered by the terms of the contract. Since TP 10-08». requires the application of “* * * one coat of the final coat * * *” to all existing surfaces, the category (b) areas obviously come within the contract work requirements. Further, since plaintiff does not point to any other contract provision which is in conflict with TP 10-08a., it is necessary for plaintiff to show that some or all of these category (b) areas were not to be painted because they are specifically excepted from the work requirements by TP 10-095. or were specifically excluded from the contract by being designated N.I.C. areas.
A considerable portion of plaintiff’s arguments relating to the incorrectness of the Board’s decision regarding category (b) areas is directed to those surfaces designated as N.R.R. (No Repairs Required) on the drawings. Plaintiff shrugs off the fact that these areas literally come within the paint requirements of TP 10-08». by accentuating the repair nature of the Phase III contract. Plaintiff’s arguments can *522 be readily disposed of, for if the parties had intended that N.RK. areas were to be excepted from the painting requirement of TP 10-08®., they could have simply accomplished this by so stating in either Technical Pi’ovision 10-08 or Technical Provision 10-09. In a case having language similar to that of TP 10-08 and TP 10-09, we noted that, “Plaintiff proffers no reason why those surfaces it contends were to remain unpainted were not listed under ‘SURFACES NOT TO BE PAINTED’ in the specifications.”[17] This same question is relevant and timely here, and the reason for plaintiff’s failure to offer an explanation appears clear.
Plaintiff attempts, once again, to exclude category (b) areas, as well as the other categories, from the contract by adding to its familiar argument that the drawings were intended to tell it where to paint, the added contention that the surfaces covered by the TP 10-095. (81) exception are shown on the drawings by the designation N.R.R.
Neither party satisfactorily explains what was intended to be excepted by TP 10-095. (8). However, for reasons more fully developed in connection with CLAIM I, we find nothing in the contract specifications which can reasonably be interpreted to direct the contractor to the drawings for the areas it was obligated to paint. Accordingly, we feel that plaintiff’s argument is unfounded, and it is not necessary to determining the meaning of TP 10-095. (8).
Plaintiff’s failure to show why the category (b) areas were not expressly excluded by Technical Provision 10-09, if that was the intention of the parties, and its unreasonable arguments concerning interpretation of the specification fail to convince us that the decision of the Board is in error. We thus conclude that plaintiff was responsible under the terms of the contract to paint category (b) areas.
'Category (c) Areas
Plaintiff states that it was forced to paint areas of the hospital which had never before been painted and that these areas obviously have no relationship to the earthquake repair *523 contract under which it was performing. Plaintiff argues that the paint requirements of the Phase III contract only reflect the intent of the parties if they are interpreted with its earthquake repair purpose as a touchstone. Accordingly, plaintiff urges that it was forced to do work beyond the requirements of the contract and should be compensated.
Plaintiff’s argument is unconvincing since the clear language of the specifications, and particularly TP 10-08, encompasses category (c) areas within its literal scope. Plaintiff offers no reasonable arguments to explain how the clear meaning of TP 10-08 can be avoided. We thus conclude that the only areas of the hospital interior which were not intended to be covered by the contract were areas specifically excepted by TP 10-095. or areas that were by mutual agreement designated N.I.C. on the drawings.
Unfortunately, as plaintiff admits, it did not develop the evidence on these points as fully as it might have. The only specific category (c) areas which plaintiff discussed in any detail are a loading dock area, and the surfaces mentioned in a Field Memo. The loading dock area can be quickly disposed of by quoting from the Board’s decision with which we agree (67-2 BCA ¶ 6568, p. 30,477) :
Other examples given of subparagraph c. are the loading dock area and windows and doors. The latter clearly come within no reasonable exception to the painting requirements. Concerning the former our attention is invited to the contractor’s letter of 24 September 1965. We find no reference in that letter (Tab 17) to the loading dock area.
However, the question raised by Field Memo No. 77[18] cannot be as quickly disposed of. The Field Memo states:
Pending Formal CCO Action:
You are hereby authorized to apply two (2) Coats of TT-P-005'5a Exterior PVA Paint over previously unpainted concrete, concrete masonry and cement plaster surfaces within all areas above the eighth (8th) floor level at the Central A-Wing Tower including the Access Booms and Storage Areas on the 8th floor, the Elevator *524 Equipment and Control Areas on the 9th. floor, the Exhaust Fan & Mech. Equipment Room on the 10th floor, and the stairway No. 1. The above 2 coats of TT-P-0055a are to be applied in lieu of the specified coatings ref. para. 10-08a. and 10-08b. (8) and (9).
The Board points out that of all the areas enumerated in the Field Memo, the unpainted stairway is the only one which was not within the scope of required painting called for by the contract. As a result of our independent review of the contract, and particularly Section 10 thereof, we agree with the Board’s conclusion. Specifically, we find that the stairway is an item which was excepted from the contract by TP 10-095. (2). Accordingly, our comments which follow are only directed to the Board’s treatment of the unpainted stairway mentioned in the Field Memo.
The Board considered the memo and concluded that it only authorized a change in paint. Further, although the Board concedes that the memo authorizes a change in paint for an area which was clearly not within the terms of the contract, it nonetheless finds that the memo “* * * cannot be a direction to paint that feature, in the absence of other evidence or protest.” The conclusion of the Board, in our view, is a victory of form over substance. The Board clearly fails to recognize the realities of the work-a-day conditions and relationships that exist on a painting job, and unnecessarily penalizes plaintiff, while, at the same time, permitting defendant to reap an unjustified windfall.
It is difficult to understand why the Board fails to recognize a responsibility on defendant’s officers to point out to plaintiff that it was doing work which was not called for by the contract. While Field Memo No. 77 is, in our estimation, enough to support plaintiff’s claim of a constructive change, additional documents are available to further strengthen plaintiff’s claim.
Specifically by way of a September 23,1965, letter, plaintiff alerted defendant’s resident engineer that it considered Field Memo No. 77, of September 22, 1965, “* * * as a directive to paint previously unpainted concrete, masonry and cement plaster surfaces, and that no option is granted by the use of the work [sic] ‘authorized’.” Plaintiff goes on to *525 reasonably request, if Field Memo No. 77 has been misinterpreted, that it be advised in writing. It appears that defendant thus had an opportunity to warn plaintiff that painting of the previously unpainted stairway was being done as a gratuity, and they would not be compensated for their work. We are not aware of any response to plaintiff’s request, and therefore conclude that defendant’s acts amounted to a compensable constructive change.
Category (d) Areas
We now turn our consideration to the last remaining areas of interior work for which plaintiff claims compensation. Namely, category (d) areas.
There appears to be agreement by the parties that plaintiff was not obligated by the contract to paint any of the surfaces designated N.I.C. in the drawings. However, there is no doubt that some of the N.I.C. surfaces were painted by plaintiff. The question which must now be resolved is whether the subcontractor did the work voluntarily, or was ordered, expressly or constructively, to paint specifically excluded areas by the contracting officer. See Gholson, Byars & Holmes Constr. Co. v. United States, 173 Ct. Cl. 374, 388, 351 F. 3d 987, 994-995 (1965). If Warren Painting Co. was actually or constructively ordered to paint N.I.C. surfaces, it is entitled to an equitable adjustment. See WRB Corp. v. United States, 183 Ct. Cl. 409, 420 (1968).
A review of the drawings indicates that several areas, including those identified as A-35, A-36, A-37, A-42 and A-55 were designated as N.I.C. areas. Nonetheless, the subcontractor painted the metal acoustical tile ceilings in the above designated areas.
Defendant brands the acts of the subcontractor as those of a volunteer and summarily dismisses them. It urges this court; to treat plaintiff’s claim in similar fashion. The Board after reviewing the evidence in support of plaintiff’s claim concluded that the contractor was not ordered or directed “* * * to paint any surfaces reasonably falling within these N.I.C. exceptions.” We disagree.
A September 18,1965, memorandum of defendant’s project *526 engineer, discloses that he was aware that plaintiff was about to paint areas that were designated as N.I.C. in the drawings. However, instead of informing the crew that the areas were by mutual agreement excluded from the painting requirements of the contract, he reprimanded the crew for not cleaning the areas that were about to be painted. The crew was reminded of the surface preparation requirements of TP 10-06 and TP 10-085. In fact after plaintiff’s acting foreman evidenced a lack of familiarity with the specifications, a set was obtained and relevant paragraphs were reviewed. The evidence goes on to show that defendant’s project engineer made a number of return visits to the N.I.C. area. Specifically the memorandum states:
At approximately 10:00 hrs. I checked to see how the painters were progressing. Corridor A-8 (ceiling) was cleaned and ready to receive paint. Approval was given to paint this area. I suggested that a couple of the men start painting this cleaned area and the rest of the crew continue to clean the remaining areas. [Emphasis added.]
The remainder of the memorandum goes on to complain about the crew’s poor preparation of certain N.I.C. areas. The concern of defendant’s project engineer, and the steps he took to insure that the N.I.C. areas were properly prepared and painted is significant.
We are satisfied that plaintiff did not act as a volunteer, but painted these N.I.C. areas after receiving the tacit and, undoubtedly, oral approval of defendant’s project engineer.
The case of Gholson, Byars & Holmes Constr. Co. v. United States, supra, is particularly helpful in its expression of the realities that exist in a situation such as we have here. Particularly significant is the following statement, which is found at page 389, 351 F. 2d at 996:
* * * Indeed, it would be a rather unusual situation for a contractor voluntarily to do substantially more work than is required by the terms of the contract, thus only to increase his costs.
We, accordingly, find that the action of defendant, by way of its project engineer, amounts to a constructive change and *527 plaintiff is entitled to an equitable adjustment for its extra work.
In summary, tlie evidence shows that plaintiff was ordered to paint at least one stairway and certain N.I.C. areas that were not within the painting requirements of the Phase III contract. The action by defendant in ordering plaintiff to paint these areas amounts to a constructive change of the contract, and plaintiff is entitled to an equitable adjustment for its extra work.
CLAIM III

Application of Excessive Standards of Worhmanship

Plaintiff claims that the standards of interior painting, quality and workmanship, to which its subcontractor was held exceed both the standards established by the contract and those customary in the trade for painting of repair work. As a result, plaintiff argues, a constructive change occurred which entitles it to an equitable adjustment for expenditure of labor and materials to meet defendant’s unusual and unnecessary high standards of work.
This very same claim, and the arguments allegedly in support thereof, was made by plaintiff to first the contracting officer and later to the ASBCA, without success. The Board after a review of the entire record, but relying primarily on TP 10-07, TP 10-10 and an August '20,1965, letter from plaintiff to its subcontractor, found plaintiff’s claim to be unsupported by the evidence and accordingly denied it.
The question of whether the Government applied too high a standard of workmanship in inspecting the work done by the subcontractor, Warren Painting Company Inc., to the interior of the building, is a question of fact. See River Constr. Corp. v. United States, 159 Ct. Cl. 254 (1962) ; Maxwell Dynamometer Co. v. United States, 181 Ct. Cl. 607, 886 F. 2d 855 (1967).
The Wunderlich Act[19] provides that an administrative decision as to factual questions is final unless it is shown to be fraudulent, capricious, arbitrary, or grossly erroneous as *528 to necessarily imply bad faith, or is not supported by substantial evidence.
The manner in which administrative determinations are to be reviewed by this court has been the subject of numerous inquiries. For example in Dittmore-Freimuth Corp. v. United States, 182 Ct. Cl. 507, 390 F. 2d 664 (1968), we pointed out that if a reasonable man, after a review of the entire record finds the evidence to be such that he could 'have reached the conclusion arrived at by the administrative tribunal, then we are precluded from substituting our judgment for that of the agency involved.
Similarly we pointed out in Carlo Bianchi and Co. v. United States, 167 Ct. Cl. 364, 367-368 (1964), cert. denied 382 U.S. 841 (1965) :
The task before this court under the Supreme Court decision is to review the determination of the Board of ■Claims and Appeals of the Corps of Engineers and decide whether there was substantial evidence in the record as a whole before that Board to justify its conclusion. In reaching our conclusion, we cannot disregard plaintiff’s evidence. However, even though we might have decided as an original matter with plaintiff on balance, the decision of the Supreme Court requires us to go further and uphold the Board’s decision if there was substantial evidence to support the Board’s decision on the record as a whole.
Our review of plaintiff’s claim is necessarily guided by the above standards.
While plaintiff interwove a number of arguments to support its claim, they all substantially fall into one of the following subheadings:
(a) the standard of acceptable workmanship to which plaintiff’s painting must be compared is that prevalent in the Anchorage area for a one-coat paint j ob;
(b) the deficiency lists, so-called punch lists, indicate that too meticulous an inspection was being imposed by the Government for a one-coat paint j ob;
(c) as a result of the imposition of higher standards of inspection, the subcontractor was put to the unnecessary expense of not only cleaning up unjustified deficiencies, but of *529 also applying excessive amounts of paint, at increased costs of time and material, to obtain job approval.
We now consider each of the claims embodied in the above subheadings to determine if there is substantial evidence to support the Board’s determination.
(a) Standard of Workmanship
Plaintiff urges that the standard of workmanship to which its subcontractor should have been held was that which prevailed in the Anchorage area. Extensive testimony by both plaintiff and defendant was elicited on this subject. Plaintiff suggests that the standard which should have been used by defendant’s inspectors is best expressed by the following testimony of an area architect:
* * * a one-coat job * * * is generally done to save the owner some money, he knows that he is not going to get the best job and that perhaps later on that he can have it probably repainted in a year or two in normal housekeeping efforts. If you want a better job, you ask for two coats.
* * * where you are inclined to see where a crack has been repaired * * * you will touch up the crack and then go over the whole surface again. Sometimes this repair work is visible or it isn’t completely covered, but you accept the job as in the best workmanlike manner.
Defendant does not disagree with this statement, and thus we accept it as stating the prevailing Anchorage standard of workmanship for a one-coat paint job.
However, there is considerable confusion in the record as to which surfaces were to receive only a touch-up and one final coat and thus were to be judged by the above standard, and which were to ¡be stippled and thus subject to perhaps another standard.
Stippling by plaintiff’s own testimony is not a touch-up and one-coat final paint job. Plaintiff goes on to explain that stippling is a method of achieving a textured effect on a surface. The additional paint and labor required to stipple a surface was adequately expressed for plaintiff by Mr. Warren, himself, who testified that it required the application of an extremely heavy coat of paint. The paint is then allowed *530 to set until its starts to dry, and then a specially adapted stipple roller is used to obtain the desired textured effect.
It is fair to conclude, from plaintiff’s own evidence that substantial portions of the interior of the hospital were stippled. Plaintiff’s own testimony further indicates that a stippling paint job requires at least two coats of paint. Indeed, the testimony as a whole clearly brings out that we are not here concerned exclusively with a one-coat paint job. It should also be emphasized that to the extent plaintiff had to stipple the interior of the hospital and thus use more paint and labor than it would have for a one-coat paint job, it has been compensated by the Board.[20]
It is significant since it points out that while there may not have been a dispute between the parties as to the prevailing standard for a touch-up and a one coat of paint job, plaintiff has not carefully shown, in those instances that it alleged the use of a wrong standard of inspection, that the surfaces were only to receive a touch-up and one final coat of paint.
Notwithstanding the extensive testimony concerning the prevailing Anchorage standard of workmanship for one-coat paint jobs, and the confusion in the record concerning whether the areas being inspected were to receive one or two coats of paint, the Board in its decision rightly pointed out that the following contract specifications set forth a standard of workmanship to which the parties agreed to be bound:
10-06 CLEANING AND PREPARATION OF SURFACES:
a. General: * * * Surfaces to be painted shall be clean before applying paint or surface treatments. * * * Painting shall not proceed until all imperfections, cracks and holes in surfaces to be painted are repaired in an approved manner. Any newly painted surfaces marred or otherwise damaged and all existing painted surfaces shall be cleaned, repaired and repainted.
íJí % # sf:
10-07 PAINT APPLICATION:

a. General:

(1) All work shall be done in a workmanlike manner, and the finished surfaces shall be free from runs, drops, *531 ridges, waves, laps, brush marks, and variations in color, texture and finish. The hiding of the last required paint coat shall be so complete that the addition of another coat of paint would not increase the hiding. All coats shall be so applied as to produce film of uniform thickness. Special attention shall be given to insure that edges, corners, crevices, welds, and rivets receive a film thickness equivalent to adjacent painted surfaces. Prior to application of final finish coats, surfaces shall be carefully examined and, where necessary, touch-ups shall be accomplished to eliminate all holidays, dull spots, or suction spots. * * *
H* * $ * #
10-10 CLEANING: * * * Paint spots, oil, or stains upon adjacent surfaces shall he removed and the entire job left clean and 'acceptable.
Our review of the record indicates that the Board correctly applied this standard in evaluating plaintiff’s claim, and we concur in its application.
(b) Meticulous Application of Standard of Workmanship
Plaintiff argues at length that the Government inspectors did not conduct their inspection in accordance with the touch-up and one final coat of paint standard of workmanship to which it should have been held. While, as concluded above, we find that plaintiff should have been held to the standards of workmanship that it agreed to in the contract, to the extent it differs from a touch-up and one final coat standard, we find that the evidence does not support plaintiff’s charge of overly critical or meticulous inspections by defendant for either standard.
A number of witnesses for plaintiff testified as to the high standard of inspection to which the job was held. Mr. Warren, himself, testified that in a one-coat paint job all that can be expected is to obtain an overall clean appearance, and that it is not unusual to have brush marks, some transparent spots, and even small skips, known in the trade as cateyes or holidays. Further testimony by plaintiff’s witnesses, supporting Mr. Warren’s testimony, went on to point out that a floodlight or flashlight was used by the inspectors to get a “real close look” at the painted surface. By this technique one witness *532 explained, the inspectors were able to “* * * go up to a wall and just about look through the paint on a one-coat job.” Other witnesses for plaintiff testified that the inspectors did not conduct a one-coat, walk-through-ltype inspection. They explained that in this type of inspection the surfaces are viewed from about four to six feet. Whereas in the inspection of the Elmendorf Hospital, the inspectors were within a few inches of the freshly painted surfaces. This, the witnesses explained, is the reason that minor type deficiencies, which normally are acceptable, were picked up and placed on deficiency lists.
When we look to defendant’s testimony, we find that there is disagreement between the parties as to how the inspections were carried out. Defendant’s testimony shows that the inspectors were told not to “nit pick the job apart,” and that the important thing in carrying out the inspection was to make sure that the surfaces were reasonably covered. Further testimony showed that the inspectors were told to, and did, conduct their inspections from a distance of four to six feet from the freshly painted surface. The testimony also shows that the inspectors were only to require a repainting of deficiencies which were noticeable from this distance.
Plaintiff’s allegation concerning the use of a “floodlight” by inspectors to test the paint coverage attained by its subcontractor is also unconvincing. Indeed the testimony of defendant’s inspectors indicates that floodlights were used primarily to inspect replastered walls to insure that all plaster cracks 'had been properly sealed, and did not show through the final coat of paint. In the instances where floodlights were employed to inspect a freshly painted room or area, it was shown that either the lighting fixture in that room or area had 'been damaged by the earthquake and no proper light source was accordingly available, or that the areas were poorly lighted and additional light was needed to facilitate the inspection.
We thus must conclude that not only is there substantial evidence in the record to support the Board’s determination, but also a noticeable lack of convincing evidence on the part *533 of plaintiff that the work was subjected to an overly meticulous inspection.
(c) Expenditure of Excessive Time and Material
Plaintiff alleges that the meticulous inspection procedure practiced by defendant resulted in the expenditure of excessive material and labor in order to have its work accepted.
While plaintiff’s testimony does indicate that its labor and material costs were significantly increased as a result of the inspection by defendant, we are not convinced. Plaintiff’s testimony is lacking in specifics and consists primarily of general statements by its witnesses.
On the other hand, defendant’s testimony showed, as a result of some 100 paint samplings, covering about 10% of the hospital surfaces painted, that over half of the hospital had a one-coat thickness of paint while the other half had between one and two coats. Thus the evidence is not clear that plaintiff used excessive amounts of paint in carrying out the work requirements of the contract. Furthermore, even if we conclude that plaintiff was forced to use excessive amounts of paint and labor, the record does not clearly show if these expenditures were made in connection with areas that were to receive the touch-up and one-coat paint job or in carrying out the stippling order of defendant, for which plaintiff has been compensated by the Board. We, therefore, agree with the Board when it said:
We find the work was not subjected to such meticulous inspections as claimed. It is not the fact, as claimed, that the single coat requirement called only for a “clean-up” job permitting certain imperfections. Technical Provision 10-07 above quoted required finished surfaces to achieve a hiding equivalent to that of an additional coat and to be free of the stated imperfections. Although this undoubtedly required a more careful and possibly fuller application than would have been necessary if another coat were to follow, the specification itself was the measure of the undertaking and it was not required to be exceeded. To a substantial degree such heavy application of the non-stipple type paint specified, as was required to support the stippling process, will be compensated under our allowance of claim item 3 above.
*534 After a careful review of the entire record, we do not find support for plaintiff’s claim for an equitable adjustment. To the contrary, we find the Board’s factual determinations are not fraudulent, capricious, arbitrary, or grossly erroneous as to necessarily imply bad faith, and that they are supported by substantial evidence.
CONCLUSIONS

CLAIM I

Plaintiff’s motion for summary judgment is denied, defendant’s cross-motion for summary judgment is granted, and the petition in this claim is dismissed.

CLAIM II

Plaintiff’s motion for summary judgment with respect to the painting of one stairway and certain N.I.C. areas is granted, and defendant’s cross-motion to that extent is denied. Further proceedings are stayed pursuant to Rule 167 for a period of ninety (90) days to afford the parties an opportunity to obtain an agency resolution of the amount of the equitable adjustment to which plaintiff is entitled.

CLAIM III

Plaintiff’s motion for summary judgment is denied, defendant’s cross-motion for summary judgment is granted, and the petition in this claim is dismissed.

 By subsequent modifications, the amount was increased to $1,509,099.67.

 Warren did not make a pre-award site investigation, and its bid was not based on its own review of tbe plans and specifications. Rather it relied on the calculations of a “professional quantity seller” to establish the area of coverage called for by the plans and specifications.

 As a result of contract modifications, and tbe Board’s equitable adjustment for the stippling of interior surfaces, the final cost for tbe painting of the interior comes to $109,33 6.03.

 ASBCA No. 11420, G7-2 BCA ¶ 6588.

 68 Stat. 81, 41 Ü.S.C. §§ 321-22 (1964).

 Ho-wever, at least one of plaintiff’s witnesses testified that the contract called for the application of a filler coat and finish coat of paint to the entire hospital exterior. Also several paint contractors who bid on the contract testified that in their opinion the contract called for an application of a latex-filler coat and one final coat of paint to the entire exterior of the hospital.

 See n. 5, supra, 41 Ü.S.C. § 322 (1964).

 Morrison-Knudsen Co. v. United States, 184 Ct. Cl. 661, 684, 397 F. 2d 826, 840-841 (1908).

 N. 4, supra, at 30,476.

 Southern Constr. Co. v. United States, 176 Ct. Cl. 1339, 364 F. 2d 439 (1966).

 The rule of contra preferentum. See, for example, Teaon Corp. v. United States, 188 Ct. Cl. 116, 411 F. 2d 1262 (1969) ; WPC Enterprises, Inc. v. United States, 163 Ct. Cl. 1, [323 F. 2d 8714 (1963) ; Peter Kiewit Sons’ Co. v. United States, 109 Ct. Cl. 390 (1947).

 Tufano Contracting Corp. v. United States, 174 Ct. d. 398, 407, 356 F. 2d 535, 540-541 (1966).

 Allied Contractors, Inc. v. United States, 180 Ct. Cl. 1057, 1064, 381 F. 2d 995, 999-1000 (1967).

 Plaintiff feebly attempts to Include the N.R.R. areas into Item 8 of TP 10-096.., but unconvincingly fails to develop the argument.

 See n. 8, supra.

 N. 4, supra, at 30,476.

 HRH Constr. Corp. v. United States, 192 Ct. Cl. 912, 918, 428 F. 2d 1267, 1270-1271 (1970).

 This September 22, 1965, memo was signed by Mr. William O. Thompson, defendant’s Project Engineer, and authorized by Lt. Col. Jack C. H&ygood, Resident Engineer and the Contracting Officer’s representative.

 N. 5, supra, 41 U.S.C. § 321.

 N. 4, supra, at 30,477-78.