**LANG BROTHERS INC., a West Virginia corporation, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 170–88 C.

United States Claims Court.

June 1, 1990.

W. Henry Lawrence IV, Clarksburg, W. Va., for plaintiff.

Scott E. Ray, Washington, D.C., with whom was Stuart M. Gerson, Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

Lang Brothers Inc. (plaintiff) contracted with the Soil Conservation Service (SCS) of the United States Department of Agriculture to construct an earthen dam across the Tug Fork River near Statts Mill, West Virginia. The construction process required plaintiff to build a cofferdam upstream from the permanent dam. The contract discussed liability for damages to the cofferdam resulting from water rising to an elevation of 642 feet or less. Heavy rains caused flood water to crest at 630.4 feet on July 9, 1985. On July 10, 1985, the unfinished cofferdam collapsed. Plaintiff now seeks reimbursement for the cost to repair the cofferdam and to replace equipment damaged in the flood. Defendant contends that the contract did not cover plaintiff's losses.

After oral argument, this court denies plaintiff's motion for summary judgment. This court grants in part defendant's cross-motion for summary judgment.

## FACTS

Lang Brothers is a contractor with over 30 years' experience constructing dams. Lang Brothers has built other dams for

SCS both before and after the case at bar. Thus, plaintiff has extensive experience with dam building.

On September 23, 1983, plaintiff contracted with SCS to construct an earthen dam in the Mill Creek Watershed near Statts Mill, West Virginia. Plaintiff began work in 1983. The contract contemplated construction in incremental stages over a three-year period. The project required plaintiff to build both a permanent dam, a dike, and a cofferdam. The cofferdam was a temporary measure designed to rechannel water during construction of the permanent dam. The cofferdam, located upstream from the permanent dam, diverted water into a 66–inch concrete pipe. This diversion provided a dry streambed at the permanent construction site.

The contract placed the new dam at the end of a narrow valley. The parties envisioned that the project would be vulnerable to floods during the construction phase. Therefore, the contract contained a provision assigning risk:

RISK OF WEATHER

The construction of the dike to elevation 625′ provides protection at the elevation of an approximate 10 year annual storm. The construction of the sheet piling coffer dam at elevation 642′ provides protection at the elevation of an approximate one year annual storm. The Government assumes the risk of damage to the permanent work at crest below the elevations stated due to the failure of the dike or coffer dam. If either the dike or the coffer dam fail, due to no fault of the Contractor, at or below the above stated elevations, a modification will be issued by the Contracting Officer to provide an equitable adjustment in costs to restore the damaged works. The Contractor remains responsible for storm damages caused by a crest greater than elevation 625′ during the second construction season or greater than elevation 642′ during the third construction season. Damage to the permanent works resulting from conditions not herein provided for remain the responsibility of the contractor.

Construction Contract, No. 170–88 C, filed May 21, 1990, Special Provision 35.

Because this provision shifted some risk to SCS during the construction phase, the contract also set forth specifications for construction of the cofferdam to narrow the window of vulnerability. Plaintiff would construct the cofferdam by driving steel pilings vertically into the streambed. The contract required plaintiff to drive these pilings to refusal (until they would sink no further). On the downstream side of these pilings, the contract demanded placement of rockfill support. To ensure timely completion of the project, the contract required plaintiff to work double shifts, six days a week.

The contract required Lang Brothers to submit a construction schedule. Plaintiff gave SCS a target date of June 22, 1985 for completion of the cofferdam. Plaintiff began construction of the cofferdam on June 14, 1985, during the third construction season, but did not complete construction by the target date. During this period, plaintiff worked neither double shifts nor six days a week.

During installation, plaintiff did not drive all pilings to refusal. Rather, plaintiff intended to drive some pilings to refusal later. By June 28, 1985, however, some of the pilings had begun to bend and lean. In a letter dated July 2, 1985, SCS threatened to withhold payment if plaintiff did not immediately drive all pilings to refusal. SCS also reminded plaintiff of the vulnerability of the cofferdam to floods and its unwillingness to be responsible for damages due to failure of the pilings. Defendant's Cross–Motion for Summary Judgment and Defendant's Response to Plaintiff's Motion for Summary Judgment, filed August 28, 1989 Exhibit 2, Appendix, at 3.

On July 9, 1985—the onset of the heavy rain—plaintiff had installed all of the pilings. Plaintiff had not yet driven to refusal the pilings on the west section of the cofferdam. The rockfill—a necessary support behind the pilings—was not in place.

Plaintiff contends that the rockfill was not in place because the streambed had not yet been inspected. Plaintiff was respon-

sible for arranging inspection of the streambed.

On July 9 and 10, 1985, heavy rains caused flooding at the construction site. The water crested at 630.4 feet. Plaintiff installed a drainage ditch to prevent the cofferdam's collapse. This effort, however, was unsuccessful. The cofferdam collapsed. The pilings that collapsed had been driven to refusal. The pilings that were not driven to refusal were not affected by the flood.

On July 11, 1985, plaintiff petitioned the contracting officer for a modification of the contract. Plaintiff sought compensation for repairs to the damaged cofferdam and replacement of equipment. Plaintiff claimed entitlement to the modification under special provision 35 of the contract.

On January 6, 1986 plaintiff made a $59,-030.44 claim for an equitable modification pursuant to special provision 35 of the contract and 41 U.S.C. § 605 (1978). The contracting officer denied plaintiff's claim on March 31, 1987. Plaintiff then filed this action in the United States Claims Court.

Plaintiff seeks payment for the cost of repairs to the cofferdam and replacement of damaged equipment. Plaintiff contends that special provision 35 assigns to SCS the risk of damages due to failure of the cofferdam. Plaintiff relies on the language of special provision 35 that provides an "equitable adjustment in costs to restore the damaged works."

Plaintiff denies any fault for the cofferdam's collapse. Plaintiff contends the contract did not specify when plaintiff had to drive the pilings to refusal. Moreover, plaintiff contends that it was not required to place the rockfill support concurrent with the pilings. Finally, plaintiff asserts that if the contract is ambiguous that SCS—as the drafter of the contract—should answer for the ambiguity.

In its cross motion for summary judgment, defendant contends that the contract read as a whole does not shift risk of loss to SCS until completion and acceptance of the work. Defendant also asserts that special provision 35 is unambiguous and only shifts risk to the Government for damage to the permanent dam.

Defendant contends further that plaintiff was at fault for the damage to the cofferdam. Defendant asserts that the contract required plaintiff to drive all pilings to refusal immediately upon installation and placement of rockfill support concurrent with the driving of the pilings. Defendant argues that plaintiff's failure to follow this procedure, as well as its failure to work double shifts, six days a week, was the proximate cause of the cofferdam's collapse.

This court must interpret the contract to determine which party bore the risk of damage to the cofferdam. This court must also determine whether the record permits a finding that plaintiff was at fault for the collapse of the cofferdam.

## DISCUSSION

### Summary Judgment

Pursuant to RUSCC 56, both parties have moved for summary judgment on the issue of contract interpretation. On this issue, the parties agree that no material facts are in dispute. Each party claims entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the parties dispute facts necessary to show whether plaintiff was at fault for the collapse of the cofferdam. This dispute prevents final resolution of the case based on the pending motions.

### Contract Interpretation

Special provision 35 of the contract allocated risk of loss between the parties. This provision contained an important aspect of the parties' agreement. SCS never had used a sheet piling cofferdam in West Virginia. Because the project was untested, SCS agreed to assume a portion of the risk.

Defendant contends that SCS agreed to assume risk of damages only to the permanent structure, not the temporary cofferdam. Defendant stresses that special provision 35 discusses the Government's as-

sumption of "the risk of damage to the permanent work."

Special provision 35, however, does not discuss damage to the permanent work alone. The provision also discusses damage to the dike or the cofferdam:

> If either the dike or the coffer dam fail, due to no fault of the Contractor, at or below the above stated elevations, a modification will be issued by the Contracting Officer to provide an equitable adjustment in cost to restore the damaged works.

The cofferdam, rather than the permanent dam, is the subject of this clause. This clause clarifies that, absent contractor fault, the Contracting Officer will pay the cost of restoring the damaged cofferdam. Indeed the clause explicitly mentions the cofferdam as one of the works that may fail. Thus, in the absence of contractor fault, SCS agreed to accept the cost of restoring the cofferdam.

Defendant counters that this clause merely adds the fault concept to the preceding sentence covering the permanent dam. The clause, however, does not refer to the permanent dam, but to "damaged works." In the context of a sentence dealing with failure of "the dike or the coffer dam," the term "damaged works" does not refer to the permanent dam. "Damaged works" in this context means "the dike or the coffer dam." If SCS intended to limit its liability to the permanent dam, it could have done so by inserting the word "permanent" before "works" in this sentence. Thus, if plaintiff lacked fault, special provision 35 assigns the costs of restoring the damaged cofferdam to the Government.

■ To the extent that the parties detect ambiguity in special provision 35, it is latent. The discrepancy between the parties' interpretations is not obvious or glaring. *Chris Berg, Inc. v. United States*, 197 Ct.Cl. 503, 515, 455 F.2d 1037, 1045 (1972). In the face of a latent ambiguity, this court must adopt, if reasonable, the interpretation of the party who did not draft the duplicitous provision. *Id.* 455 F.2d at 1044; *William F. Klingensmith, Inc. v. United States*, 205 Ct.Cl. 651, 657, 505 F.2d 1257,

1261 (1974) (per curiam). Plaintiff's interpretation of special provision 35 is reasonable. The Government drafted this contract. Therefore, even if the parties perceive an ambiguity in special provision 35, this court determines that SCS assumed, absent fault of the plaintiff, risk of damage to the cofferdam.

Defendant also contends that interpreting special provision 35 to place the risk of damage to the cofferdam on the Government conflicts with other provisions of the contract. Sections 10 and 12 place all risk of damages on the contractor until after completion and acceptance. This court, however, perceives no conflict between special provision 35 and these sections of the contract.

■ Special provision 35 governs a specific category of risks during contract performance—weather conditions causing failure of the cofferdam. Sections 10 and 12 generally govern other risks. The parties drafted special provision 35 to control vulnerability to flood waters during construction. The general provisions of §§ 10 and 12 apply to other circumstances. Therefore, this court follows the generally accepted contract principle that "when there are two clauses in a contract which are in any respect conflicting, the clause which is specially directed to a particular matter ... controls over a clause which is general in its terms ... although within its general terms the part may be included." *United Pac. Ins. Co. v. United States*, 204 Ct.Cl. 686, 694, 497 F.2d 1402, 1406 (1974); *see also, W.E. Callahan Constr. Co. v. United States*, 91 Ct.Cl. 538 (1940); *Occidental Life Ins. Co. v. Marmaduke Corbyn Agency*, 187 F.2d 553 (10th Cir.1951).

Furthermore, the cofferdam was a temporary measure which plaintiff had to dismantle before completion of the project. Under defendant's interpretation of the contract, special provision 35 would have no meaning as applied to the cofferdam. The cofferdam works would be covered by §§ 10 and 12, thereby eliminating any need for special provision 35. Yet, special provision 35 is not surplusage. This court cannot ignore the language of special provi-

sion 35. By its terms, special provision 35 controls in the event of failure of the cofferdam. Therefore, this court reads special provision 35 to place the risk of loss for damages to the cofferdam, before completion, on the defendant, as long as plaintiff was not at fault for the damage. Thus, reading the contract as a whole and giving each provision its intended meaning, this court perceives no conflict between contract provisions. The provisions of special provision 35 govern the facts of this case.

### Fault

Special provision 35 allocates to the Government the risk of loss only when the damage is "due to no fault of the contractor." This fault provision protected SCS in the event that plaintiff's malfeasance caused collapse of the cofferdam. Indeed the contract contained several provisions setting forth plaintiff's obligations to ensure swift and sure completion of the cofferdam. Plaintiff did not follow some contract terms. Plaintiff did not, for instance, drive all pilings to refusal. Plaintiff also violated special provision 8 by failing to work double shifts, six days a week. Nor did plaintiff adhere to its construction schedule.

The contract included special provision 35 because the parties envisioned a period when the construction would be vulnerable to flood damage. The Government agreed to assume a share of this risk. Even though the Government agreed to assume risk, Lang Brothers, as a reasonably prudent contractor, had a duty to narrow the window of vulnerability and thereby minimize the Government's risk. For this reason the construction contract required Lang Brothers to submit a construction schedule. In compliance with this requirement, plaintiff designated June 22, 1985 as the projected cofferdam completion date. Under the circumstances of this case, a reasonably prudent contractor would have acted diligently to adhere to its schedule and thereby narrow the window of vulnerability.

The original contract required plaintiff to place rockfill support behind the pilings. The contract did not state a specific time for rockfill placement. In the absence of specific timing, the parties contemplated that plaintiff would place the rockfill within a reasonable time. In light of the threat of flood damage, a prudent and experienced contractor likely would have considered as dangerous any delays in rockfill placement.

The rockfill was necessary to provide support for the pilings. Absent rockfill, the cofferdam was vulnerable to rising waters. Indeed, when the pilings began to bend and lean on June 28, 1985, plaintiff likely had notice that it needed to support the pilings with rockfill. While contending that it delayed rockfill placement pending inspection of the streambed, plaintiff must acknowledge that it had the duty to obtain approval for placement of the rockfill. When the cofferdam failed, 12 days later, the rockfill had not been placed. Plaintiff admitted that the cofferdam was not likely to collapse if the rockfill had been in place. Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment, filed June 26, 1989 (Pl.Br.), at 6. Plaintiff suggested at oral argument, however, that the court does not have information necessary to decide if plaintiff's delay caused the cofferdam to fail.

The contract required plaintiff to drive all pilings to refusal. Plaintiff had not complied with this provision at the time the cofferdam collapsed. On July 2, 1985, SCS threatened to withhold payment unless plaintiff drove all pilings to refusal. SCS also emphasized the cofferdam's vulnerability to floods. When the cofferdam collapsed on July 10, 1985, plaintiff had not yet driven all the pilings to refusal. The pilings that failed, however, were those plaintiff drove to refusal. Conversely, the pilings that plaintiff did not drive to refusal remained intact. SCS Inspector Harvey Mitchell testified that failure to drive the pilings to refusal did not cause the damage to the cofferdam.

Plaintiff's failure to drive timely the pilings to refusal nevertheless may have contributed to the delayed placement of rockfill. Plaintiff could not place the rockfill until it drove the pilings to refusal. Thus,

plaintiff's failure to drive timely the pilings to refusal may have widened the window of vulnerability.

Plaintiff did not work double shifts, six days a week, as required by special provision 8. Plaintiff gave SCS a target date of June 22, 1985 for completion of the cofferdam. Yet, when plaintiff failed to meet that date it did not step up its work schedule to comply with special provision 8. Nor did plaintiff step up its work on June 28 or July 2. If plaintiff had worked the prescribed hours to complete construction and support of the cofferdam, the temporary structure may have withstood the flood of July 9 and 10. The completed cofferdam withstood flood waters at 640 feet in early November, 1985. Compliance with the contractual requirement of double shifts and a six day work week also would have narrowed the window of vulnerability.

■ While the record exposes these instances where plaintiff did not fully comply with contract terms, the parties disagree whether such non-compliance in fact caused the cofferdam collapse. At oral argument, plaintiff suggested that the court did not possess all facts concerning the timing of the rockfill placement. Defendant also could not state conclusively either that plaintiff unreasonably delayed rockfill placement or that plaintiff's actions caused the collapse.

Therefore this court will not grant either party's motion for summary judgment. This court anticipates trial on the question of whether plaintiff is at fault for collapse of the cofferdam.

■ Plaintiff's prayer for relief, however, improperly seeks reimbursement for equipment damaged in the flood. Special provision 35 shifts the risk to the Government for restoration of the "damaged works," not for equipment losses. Plaintiff has not offered evidence of any other provision of the contract that would require SCS to pay for plaintiff's equipment losses. The contract does not address replacement of equipment. Therefore, to the extent plaintiff seeks equipment costs, this court grants partial summary judgment for defendant.

## CONCLUSION

The contract shifted the risk of damage to the cofferdam to the Government. Specifically, special provision 35 shifts the risk of the loss to the Government so long as the contractor is not at fault.

The question of whether plaintiff is at fault for the failure of the cofferdam is in dispute. This court anticipates a trial on that single question.

Therefore, this court denies plaintiff's motion for summary judgment. This court grants in part defendant's cross-motion for summary judgment as to plaintiff's request for replacement of its damaged equipment. The court denies defendant's cross-motion on the issue of reimbursement for repairs to the cofferdam.