**ITT FEDERAL SERVICES CORPORATION, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Northrop Grumman Technical Services, Inc., Defendant–Intervenor.**

No. 98–731 C.

United States Court of Federal Claims.

Oct. 29, 1999 [1].

1. This opinion was issued under seal on September 29, 1999. Pursuant to ¶ 2 of the ordering language, the parties were instructed to identify protected/privileged material subject to deletion. Neither plaintiff nor defendant proposed any redactions. Intervenor proposed redactions to which plaintiff has objected. After carefully considering plaintiff's objection and Intervenor's Revised Request for Deletion of Protected Material from the Court's Published Opinion, the court determines that a portion of the material which the intervenor desires to redact does not contain any trade secrets or confidential financial information that is protected from public disclosure as a matter of law, *see* 5 U.S.C. § 552b(c)(4), while a portion of such material may contain protected information. Accordingly, the court denies intervenor's request in part and grants intervenor's request in part. Brackets identify where material has been deleted.

Thomas O. Mason, McLean, VA, for plaintiff. Robert M. Cozzie, Scott A. Ford, and John M. Manfredonia, McLean, VA, of counsel.

Alan J. LoRe, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Bryant G. Snee, Assistant Director, Department of Justice, Washington, DC, for defendant. Lt. Col. Randall J. Bunn and Larry J. Gusman, Department of the Air Force, Air Force Legal Services, Arlington, VA, of counsel.

Richard P. Rector, Washington, DC for defendant-intervenor. Kevin P. Mullen, Washington, DC, of counsel.

*OPINION AND ORDER*

HEWITT, Judge.

This post-award bid protest action comes before the court on cross motions for judgment on the administrative record. Plaintiff, ITT Federal Services Corporation ("ITT"), protests the decision of the United States Air Force, Air Combat Command (the "Air Force" or "agency") to award a contract to Northrop Grumman Technical Services, Inc. ("Northrop Grumman" or "Intervenor") for Counterdrug Surveillance and Control System ("CSCS") support. Northrop Grumman is an intervenor in the proceeding.

ITT challenges the contract award on the ground that the Air Force did not properly evaluate its proposal under the terms of the solicitation, specifically, that the agency improperly evaluated the Management/Technical and Past Performance areas of its proposal; that the agency gave improper weight to the price of Northrop's proposal; and that the award decision is inconsistent with the identified "best value" award criteria and the agency's own evaluation of ITT's and Northrop's proposals. In addition, ITT alleges that the Air Force improperly permitted the contract awardee to deviate from the solicitation requirements regarding personnel security staffing and cost accounting for security vehicles.

For the following reasons, the court denies the protest.

## I. Background

On January 23, 1998, the Air Force issued Solicitation No. F44650–98–R0001 (the "solicitation") for a combination firm-fixed-price and cost-reimbursable contract to provide "all personnel, equipment, tools, materials, supervision, and other items and services necessary to perform operations, maintenance, and support (OM & S)" for the CSCS.[2] Administrative Record ("AR") at 97.

---

**2.** The CSCS program provides air surveillance in support of the United States and Allied counterdrug efforts in the Caribbean and Latin America. AR at 1652. With sites located in Florida, Colombia, Equador, Panama, Peru, and Venezuela, the CSCS program allows the Air Force to monitor the movements of potential drug courier air-

craft and to intercept shipments traveling to the United States. *ITT Federal Services Corporation v. United States*, No. 98–731, slip op. at 2 (Ct. of Fed. Cl. Sept. 30, 1998) (filed under seal). Using a network of radar systems, CSCS identifies potential drug trafficking flight operations in the "source zone" and relays that information to

The contract was for a one-year term with four one-year options. *Id.* at 48. The total estimated cost of the contract was $109 million. *Id.* at 1605.

### A. Basis for Award

The solicitation stated that the award decision would be made by the Source Selection Authority ("SSA") "to the offeror ... whose proposal is judged ... to be the most advantageous to the Government" on the basis of an integrated assessment of six general considerations and three specific evaluation criteria.[3] *Id.* at 89. Proposals would not be rated on the general considerations but would be reviewed for compliance with the Performance Work Statement ("PWS") and applicable FAR requirements. *Id.* at 89.

Section M–74d of the solicitation outlined the three evaluation criteria for the contract: (1) Management/Technical, (2) Past Performance, and (3) Price. *Id.* at 90. The areas of Management/Technical and Past Performance were equal in importance and each was more important than Price. Id. Although of lesser importance, Price was a

substantial factor in determining overall value in the evaluation of the award. *Id.*

The Management/Technical area of a proposal would be evaluated on seven major factors: (1) Organization and Manpower; (2) Operations; (3) Communications Electronics Maintenance/Communications; (4) Logistics/Transportation; (5) Civil Engineering; (6) Quality Control; and (7) Maintenance Management.[4] *Id.* Past Performance would be evaluated on five factors, in descending order of importance: (1) Operations Maintenance and Support of Radar Systems; (2) Operations Maintenance and Support of Command Control and Communications; (3) Operations Maintenance and Support of systems/programs in remote overseas locations within the USSOUTHCOM area of responsibility; (4) Operations and Maintenance on other Systems/Programs; and (5) Performance Risk Assessment. *Id.* at 297–98. In evaluating the enumerated factors in the areas of Management/Technical and Past Performance, the Air Force would assign color/adjectival ratings and risk assessment ratings.[5] *Id.* at 89.

The solicitation further stated:

---

surveillance systems in the United States and to host nation command and control centers as potential interdiction targets. *Id.* The CSCS has three principal components: U.S. and host nation radar sensors, a supporting communications infrastructure, and command and control operations centers. AR at 1652.

The CSCS contract combined several separate contracts which had been previously awarded for services in connection with counterdrug surveillance, including: (1) the operations, maintenance, and support services provided for the Caribbean Basin Radar Network ("CBRN") in seven sites by ITT, the incumbent contractor; (2) the commercialized Ground Mobile Radar ("GMR") operations at two sites in Colombia operated at the time of the award by Booz–Allen & Hamilton; (3) an additional GMR site in Iquitos, Peru for which operations were provided by the Air National Guard and active duty Air Force personnel; and (4) a Host Nation Command Center ("HNCC") which was, at the time of the award, under contract to GLS Associates. *ITT Federal Services Corp.*, slip op. at 2.

3. The general considerations were: (1) a pre-survey award, (2) a small, small disadvantaged, and women-owned small business subcontracting plan, (3) a government property plan, (4) a transition plan, (5) environmental, fire prevention, and health programs, and (6) a security

plan. AR at 89–90. Except for the security plan, the general considerations are not part of this dispute.

4. According equal importance to the first two factors, the solicitation provided that the remaining factors were in descending order of importance. AR at 90–91. The solicitation also outlined subfactors within each major factor requiring evaluation. *Id.* at 91–92.

5. As defined in AFFARS Appendix BB, Subpart BB–304(b), the color/adjectival ratings are: (1) Blue (Exceptional)—exceeds specified performance and has no significant weakness; (2) Green (Acceptable)—meets the evaluation standards and any weakness is readily correctable; (3) Yellow (Marginal)—fails to meet evaluation standards; however, any significant deficiencies are correctable; and (4) Red (Unacceptable)—fails to meet minimum contractual requirements and the deficiency is uncorrectable without a major revision of the proposal. Plaintiff's Appendix in Support of Its Motion for Summary Judgment ("Pl.'s App.") at 103. The regulations also require that the government assign two risk assessment ratings. Pl.'s App. at 105 (AFFARS Appendix BB, Subpart BB–305). Specifically, the government must assess: (1) an offeror's proposed approach to accomplishing the requirements of the solicitation (proposal risk) and (2)

As a basis for award, price is of secondary consideration and will not be rated or scored. THEREFORE, THE GOVERNMENT RESERVES THE RIGHT TO AWARD TO OTHER THAN THE LOWEST PROPOSED PRICE. However, the degree of importance of price as a factor could become greater depending upon the equality of the proposals for areas evaluated. The greater the equality of proposals, the more important price and other price factors become in selecting the best value to the Government.

*Id.* at 89. Under the terms of the solicitation, the price of a submitted proposal would be evaluated for realism, completeness, and reasonableness. AR at 298. The Air Force would evaluate whether the bid costs were realistic for the work to be performed and were consistent with the technical elements of an offeror's proposal. *Id.* To evaluate the reasonableness of the price, the agency would compare the proposed prices "with the independent Government cost estimate and proposed prices submitted by other offerors." *Id.*

In addition to evaluating the Management/Technical, Past Performance and Price areas of a proposal, the agency would assess each submitted proposal for overall soundness of approach, completeness, and compliance with the requirements. *Id.* at 90. As stated in the solicitation, "[s]ubjective judgment on the part of the Government is implicit in the Source Selection process" of determining which proposal offered the "best value." *Id.* at 89–90.

### B. Security Staffing Requirements

One of the six general requirements detailed in the solicitation was a security plan for each CSCS site. The solicitation required offerors to include in their proposals a

personnel protection security plan that complied with applicable Government regulations and the requirements of the PWS. *Id.* at 90.

The PWS outlined the staffing requirements for CSCS personnel security, which were based on: (1) the level of the security threat (classified as either high, moderate, or low) assessed by the Embassy Regional Security Officer ("RSO") and (2) the RSO's recommended security staffing levels. *Id.* at 306. Technical Exhibit 12 to the PWS detailed the RSO's security assessments and recommended security staffing levels for five of the CSCS sites, namely (1) Iquitos, Peru, (2) Leticia, Colombia, (3) Marandua, Colombia, (4) San Jose del Guaviare, Colombia and (5) Bogota, Colombia.[6] *Id.* at 306, 310–327. The personnel security arrangements recommended for the Marandua site included:

A bilingual American Security Coordinator (ASC)—typically a former U.S. Army Special Forces or U.S. Navy Seal Team member. This individual will have significant experience in various aspects of security to include physical security, risk management, threat analysis, intelligence gathering/evaluating, and personal protection....

A Colombian Security Coordinator (CSC)—typically a former Colombian military or police officer. This individual will have the required experience and training to ensure the professional behavior of the security team....

Security/Body Guards. Three body guards/drivers are required to provide personal protection to American site personnel.

Two electronic monitoring specialists, who will operate the Sensor System. These specialists would also be trained bodyguard/drivers.

an offeror's ability to perform successfully as proposed (performance risk). *Id.* The applicable ratings for risk assessment are: (i) High—[l]ikely to cause serious disruption of schedule, increase in cost, or degradation of performance even with special contractor emphasis and close [g]overnment monitoring; (ii) Moderate—[c]an potentially cause some disruption of schedule, increase in cost, or degradation of performance, but difficulties can probably be overcome with special contractor emphasis and close government monitor-

ing; or (iii) Low—[h]as little potential to cause disruption of schedule, increase in cost, or degradation of performance and difficulties can probably be overcome with normal contractor effort and government monitoring. *Id.*

**6.** No RSO security assessments or recommended staffing levels were provided for: (1) San Andreas, Colombia, (2) Riohacha, Colombia, (3) Monte Cano, Venezuela, (4) El Copey, Venezuela, or (5) Caracas, Venezuela. AR at 310.

*Id.* at 319–20. The PWS, as revised by Solicitation Amendment 0006 ("Amendment 0006"), also required that "[p]roposed security levels above or below the levels endorsed by the applicable RSO shall include a threat assessment and rationale justifying the level of security proposed."[7] *Id.* at 306.

In outlining its proposed security plan, Northrop addressed the security threat to the Marandua location and assessed the vulnerability of the site. *Id.* at 3291. Based on the identified safety concerns, Northrop proposed a five-person rather than the recommended seven-person security team. *Id.* at 3291–92. Northrop designated the three bodyguards to perform the additional duties of the two electronic monitoring specialists rather than providing dedicated personnel to serve as electronic monitoring specialists. *Id.*

Similarly, following the issuance of Amendment 0006, ITT submitted a revised proposal, dated June 24, 1998, to provide three security/bodyguards in addition to the American and Colombian Security Coordinators for the Marandua site. *Id.* at 2291. ITT's proposal stated:

> Three bodyguards will operate the Sensor System. These specialists would also be trained bodyguard/drivers.

*Id.* In its final proposal of July 15, 1998, however, ITT offered to staff the Marandua site at the recommended level of seven dedicated personnel. *Id.* at 2382.

### C. Security Vehicles

The PWS, as revised by Amendment 0006, also required that an offeror provide as leased equipment any security equipment, including armor reinforced vehicles, needed to implement additional security at a CSCS site. *Id.* at 307. Paragraph 5.10.6.2.2 of the PWS specifically stated that "[s]ecurity equipment (firearms, communications equipment, armor reinforced vehicles, general purpose vehicles, etc.) *required to implement*

additional security shall be provided as leased equipment and will not become the property of the government." *Id.*

The Administrative Record shows that in June 1998, the Procuring Contracting Officer ("CO"), Sharon Potter, received an inquiry from an offeror "expressing concern over which CLIN [Contract Line Item Number] to use to price security vehicles." *Id.* at 4249. The Administrative Record further shows that the CO treated the inquiry as a formal request for clarification of a possible ambiguity in the PWS. *Id.* at 4248. Accordingly, the CO issued her formal clarification which serves as a definitive interpretation of the PWS, binding on all offerors and the government. *See PHH Homequity Corporation,* B–237182, 1989 U.S. Comp. Gen. LEXIS 1508 (Oct. 31, 1989). The Administrative Record reflects that, in a notation to the file, the CO:

> explained that pricing for security vehicles needed to be included in CLIN 0X24 for Personnel Security. Any vehicles purchased under CLIN 0X25AB [Investment Items/Vehicles] will become the property of the Government and any security vehicles will remain the property of the contractor .... A letter containing this information was faxed to all offerors.

AR at 4249.[8] The letter that the CO faxed to all offerors stated:

> This letter is issued to clarify how security vehicles, if determined to be necessary by an offeror, should be priced on the subject solicitation. If offerors determine that vehicles are needed in order to support the security requirements of the CSCS solicitation, then the vehicle(s) shall be considered security equipment IAW paragraph 5.10.6.6.2 (sic; should read 5.10.6.2.2) and shall be included as part of security services provided under the firm fixed price CLIN 0X24, Personnel Security. Vehicles for providing security services under

---

7. The CO issued Amendment 006 for the purpose of making, among other modifications to the PWS, certain clarifications regarding the security requirements under the Solicitation. AR at 304–308.

8. Contract Line Items Numbers (CLINs) change in the hundredths column to indicate each con-

tract year (e.g., Basic Year CLIN is 0101, First Option Year is 0201, Second Option Year is 0301). AR at 44. We understand the CO to have used "X" (as in "0X24") to indicate that her guidance applies to all contract years.

CLIN 0X24 will not become the property of the government.

*Id.* at 4248.

[ ]. *Id.* at 3630, 3634. Northrop treated the costs associated with the security vehicles lease as [ ]. *Id.* at 3705. Northrop did not include the costs in CLIN 0X24.[9]

ITT also placed security vehicle costs outside CLIN 0X24. The record reflects that ITT placed the cost of three armored vehicles in CLIN 0099. *Id.* at 2471, 2486, 2562.

### D. Proposal Evaluations

The Source Selection Evaluation Team ("SSET"), comprised of a technical team and a contract team, evaluated the submitted proposals.[10] *Id.* at 1524. The SSET determined that three of the offerors were in the competitive range, including ITT and Northrop. *Id.* at 1525. The evaluation team prepared a Proposal Analysis Report ("PAR") summarizing its findings, *see id.* at 1519–49, and determined the following:

#### 1. ITT's Proposal

ITT's proposal received a low risk evaluation. *Id.* at 1547. In the Management/Technical area, ITT received two blue (exceptional) rating and five green (acceptable) ratings. *Id.* at 1526–38. The SSET also identified two significant strengths, 29 strengths, and one weakness in the Management/Technical area of ITT's proposal.[11] *Id.* at 1683–87. Twenty-one of the strengths were in the factors for which ITT received green ratings. *Id.* at 1526–38.

For past performance, ITT received a low risk Performance Risk Assessment (Factor 5). *Id.* at 1541. ITT also earned blue (exceptional) ratings for two of the four color ratable factors. *Id.* at 1538, 1540. Although ITT had submitted information regarding prior contract performance, the SSET concluded that "[p]ast performance history unique to this factor was not available for this evaluation" and assigned neutral ratings of N/A to the remaining two color ratable factors, Factors 2 and 3.[12] *Id.* at 1539–40.

#### 2. Northrop's Proposal

Northrop's proposal received low risk assessments in all areas but Logistics/Transportation Support (Factor 4) in the Management/Technical area. The SSET assigned a moderate risk to Factor 4 stating that "[t]he proposed vehicle maintenance capability by a local vendor at CSCS sites was inadequate for Marandua." [13] *Id.* at 1532–33. In the Management/Technical area, Northrop received seven green (acceptable) ratings. *Id.* at 1526–38. Northrop also received one significant strength, three strengths and one significant weakness. *Id.* at 1678.

For past performance, Northrop received one blue (exceptional) and one green (acceptable) rating. *Id.* at 1538, 1540. Northrop received neutral ratings of N/A for Factors 2 and 3. *Id.* at 1539–40.

---

9. [ ]. AR at 3705. [ ]. *Id.* at 3556, 3560, 3609, 3614, 3619, 3624.

10. The Air Force received proposals from 21 offerors. AR at 1549.

11. As defined in AFFARS Appendix BB, Subpart BB–103(b), " '[s]trength' means a significant, outstanding, or exceptional aspect of an offeror's proposal that exceeds the evaluation standard and provides a useful capability that will be included in the specification, or statement of objectives or statement of work, or is inherent in the offeror's process.' " Pl.'s App. at 108. A 'weakness' is defined as "an aspect of or omission from an offeror's proposal that contributes to a deficiency in meeting an evaluation standard or is otherwise a shortcoming of the proposal that has the potential to degrade contract performance." *Id.*

12. For past performance consideration, ITT identified four of its prior government contracts including the Caribbean Basin Radar Network contract, one of the service contracts for counter-drug surveillance absorbed into the CSCS contract. AR at 1811–13. ITT specifically addressed how the four contracts showed its ability to perform successfully the CSCS work requirements under each of the four ratable Past Performance evaluation factors. *Id.* at 1814–20.

13. Northrop proposed to use local vendors for vehicle maintenance that exceeded the site personnel's capability, although the Marandua site has no local vendors who could provide such maintenance. AR at 1544. Thus, the evaluation team assigned an elevated risk rating to Northrop for Factor 4 (Logistics/Transportation Support) in the Management/Technical area. *Id.*

### 3. Price Comparison

The SSET conducted a comparative price analysis of the proposals and determined that the offerors' prices were reasonable based on adequate competition. *Id.* at 1541. Each of the offerors submitted proposals based on a local Program Management Office ("PMO"). *Id.* at 1542. In addition, as authorized under the PWS, ITT submitted an alternative proposal based on a PMO located outside of the local area. *Id.* The total overall evaluated prices of ITT's respective proposals were $38.1 and $37.5 million. *Id.* at 1547. The total overall evaluated price of Northrop's proposal was $32.6 million. *Id.* In accordance with the source selection plan, the SSET did not score the bidders' prices, but did review the proposals for realism, reasonableness, and completeness. *Id.* at 1542.

In evaluating price, the SSET performed a detailed analysis of the bidders' price differences, specifically comparing the proposed prices for: (1) program management, (2) OM & S sites, (3) GMR sites, (4) security, (5) CRDLs [Contract Data Requirements Listing], and (6) other CLINs in the contract. *Id.* at 1543. In comparing ITT's (local PMO) proposal to Northrop's proposal, the SSET noted that Northrop's offer included limited travel for the program management staff to visit the sites while ITT's offer permitted additional travel by program management staff to the various sites, which the SSET recognized as a strength. *Id.* The SSET also noted that ITT "may have better insight into the necessary manning of the [OM & S] sites than Northrop" as ITT was the current provider of OM & S services under the Caribbean Basin Radar Network contract. *Id.* The SSET attributed the price difference in the proposals for the GMR sites to the offerors' approach to OM & S at the Marandua site.[14] *Id.* at 1544. The SSET attributed the price

difference in security between Northrop and ITT to the number of proposed security personnel and the choice of security subcontractor.[15] *Id.*

The SSET submitted its composite findings to the SSA.

### E. The Source Selection Decision

In a handwritten note dated August 15, 1998, the SSA, Major General Dennis G. Haines, informed the CO and the SSET Chairperson that he had awarded the contract to Northrop. AR at 1620. He explained that after reviewing both proposals he "could not find significant difference except ITT's experience in running sites under the current contract. While this is a significant benefit, it is not sufficient to overcome the cost delta in the two proposals." *Id.*

General Haines issued the source selection decision on August 15, 1998. *Id.* at 1550–1552. He wrote:

> Pursuant to AFFARS Appendix BB and as the Source Selection Authority for this acquisition, I have determined that the Counterdrug Surveillance and Control System (CSCS) proposal as submitted by Northrop Grumman Technical Services, Inc., provides the best overall value to support U.S. and Allied counterdrug efforts throughout Central America, South America, and the Caribbean. This selection was based upon criteria established in Section M of the Request for Proposal (RFP), "Evaluation Factors for Award," and my integrated assessment of the proposals submitted in response to the RFP, the terms and conditions agreed upon during negotiations, and the capability of Northrop Grumman Technical Services, Inc. to fulfill the requirements of the solicitation as depicted in their offer.

---

14. Northrop proposed to use local vendors for vehicle maintenance at the site. *See* AR at 1544.

15. ITT's proposal included more security personnel. AR at 1544. In its final proposal, ITT provided two dedicated personnel to conduct the electronic surveillance system monitoring at Marandua while Northrop used two of the three driver/bodyguards to perform the monitoring duty. *Id.* Additionally, ITT proposed four additional security personnel over those proposed by

Northrop, specifically, a security coordinator and two guards at San Andres as well as one bodyguard/driver at Riohacha. *Id.* The SSET commented that, while ITT "may have a better perspective regarding the security situation at [the San Andres and Riohacha] sites," which were then part of ITT's Caribbean Basin Radar Network contract, both offers were acceptable because the RSO did not recommend staffing levels for the sites. *Id.*

*Id.* at 1550. Comparing the proposals of ITT and Northrop, General Haines stated:

ITT FSC has slightly lower risk than Northrop (Logistics/Transportation) and exceeds specified performance in a way beneficial to the Air Force for two factors (Communications–Electronics Maintenance/Communications and Civil Engineering). Additionally, for the past performance factor of OM & S of Radar Systems, ITT FSC was rated "Exceptional," indicating that they exceeded specified performance or capability in a beneficial way to the Air Force, whereas Northrop was rated "Acceptable," indicating that they met evaluation standards. Considering the relative order of importance of the evaluation criteria, a close assessment was necessary to determine the value of ITT FSC's superior proposal characteristics for their higher price as compared to Northrop's. In making this comparison, the $5.5M (or $4.9M as compared to ITT FSC's Florida PMO) difference in total price, $4.5M of which is security related, is **not** offset by the superior characteristics of ITT FSC's Management/Technical proposal and past performance.

*Id.* at 1551 (bold in the original). General Haines added:

Northrop has a solid proposal indicating they should be able to comply with the terms and conditions of the resultant CSCS contract to include the PWS. As shown by their Performance Risk Assessment rating of "Low" and based on their past performance record, there is little doubt that Northrop can perform the proposed effort. The moderate risk assessed under Logistics/Transportation denotes a potential to cause some disruption of schedule, increase in costs, or degradation of performance; however, special contractor emphasis and close Government monitoring will probably be able to overcome

difficulties. The effort associated with the potential increase in closer Government monitoring does not offset the significant savings.

*Id.* Based on his assessment of the proposals in light of the specified evaluation criteria, General Haines concluded that Northrop offered "the overall best value to the Government." *Id.* at 1552.

F. Post–Award Bid Protest

On September 18, 1998, ITT filed suit in this court alleging that the Air Force violated the Competition in Contracting Act ("CICA"), the Federal Acquisition Regulations ("FAR"), and the Air Force FAR Supplement ("AFFARS") by failing to evaluate the submitted proposals and award the CSCS contract in accordance with the applicable criteria set forth in the solicitation.[16] Plaintiff sought a temporary restraining order and preliminary and permanent injunctive relief.

On September 30, 1998, the court issued an opinion filed under seal denying the temporary restraining order and the preliminary injunction.[17] The court relied upon the administrative record as it existed at that time, the pleadings of the parties, the hearing testimony of the SSA, and the oral argument of counsel.

Plaintiff now moves for summary judgment on the administrative record. Plaintiff alleges that the SSA abused his discretion by failing to follow the solicitation's source selection criteria. Specifically, plaintiff asserts that the SSA conducted an improper cost/technical tradeoff, failing to give proper credit to plaintiff for its past performance and improperly crediting Northrop Grumman as an original equipment manufacturer. Plaintiff further asserts that the defendant improperly permitted Northrop Grumman to deviate from the security staffing requirements of the solicitation and the accounting requirement for the cost of security vehicles.

---

**16.** ITT first protested the award to the General Accounting Office ("GAO") on September 4, 1998, within the time period necessary to obtain automatic suspension of the CSCS contract pursuant to 31 U.S.C. § 3553(d)(3)(A)(Supp.1997). Complaint ("Compl.") at ¶ 54. The Air Force notified ITT ten days later that it had issued an override of the statutory contract suspension to enable Northrop to begin performance on the October 1, 1998 start date. Compl. at ¶ 55.

**17.** The case was transferred from Senior Judge Lydon to Judge Hewitt on February 4, 1999.

Alleging that the administrative record does not adequately document the basis for the SSA's source selection decision, plaintiff contends that its proposal was not fairly considered and that defendant's contract award was arbitrary and capricious. Defendant and Intervenor contradict plaintiff's allegations and move for summary judgment on the adequacy of the administrative record and other evidence supporting the SSA's decision.

## II. Discussion

### A. Standard of Review

This court has jurisdiction over ITT's post-award bid protest action under the 1996 amendments to the Tucker Act. *See* 28 U.S.C. § 1491(b)(1) (Supp. III 1997). The court reviews the challenged agency action according to the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1994). *See* 28 U.S.C. § 1491(b)(4).

■ The court must determine whether or not defendant's actions toward ITT were: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

5 U.S.C. § 706(2). In determining whether an agency has acted arbitrarily or capriciously, the court considers whether: (1) there was subjective bad faith on the part of procurement officials; (2) there was not a reasonable basis for the procurement decision; (3) the procuring officials abused their discretion; and (4) pertinent statutes or regulations were violated. *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1203–04 (1974); *Metric Sys. Corp. v. United States,* 42 Fed.Cl. 306, 310 (1998). There is, however, no requirement that each of these factors be present "to establish arbitrary and capricious action by the government." *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988). The complainant must demonstrate by a preponderance of the evidence that defendant's actions towards

it were arbitrary and capricious. *Graphic-Data, LLC v. United States,* 37 Fed.Cl. 771, 779 (1997).

■ Furthermore, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *See Candle Corp. v. United States,* 40 Fed.Cl. 658, 665 (1998) (*quoting Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996)). *See also Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995) (only clear and prejudicial violations warrant relief). To demonstrate prejudice, "the protester must show 'that there was a substantial chance it would have received the contract award but for th[e] error.'" *See Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)). *See also ACRA, Inc. v. United States,* 44 Fed.Cl. 288, 296–97 (1999).

■ While a review of agency action under the APA requires a "thorough, probing, in-depth review" to determine "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), contracting officials may nevertheless properly exercise wide discretion in their evaluation of bids and the application of procurement regulations. *Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985); *see RADVA Corp. v. United States,* 17 Cl.Ct. 812, 818 (1989), *aff'd without op.,* 914 F.2d 271 (Fed.Cir.1990). This discretion is especially broad in negotiated procurements, such as the one involved in the present case. *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 726 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). In this regard, the court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998). Indeed, "[t]he court should not substitute its judgment on such matters for that of the agency, but should intervene only when it is clearly determined that the agency's determinations were irrational or unrea-

sonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974), *aff'd,* 425 U.S. 901, 96 S.Ct. 1488, 47 L.Ed.2d 750 (1976).

■ The scope of an APA review of agency actions is generally limited to the administrative record developed by the agency. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). The court, however, may allow the parties to supplement the administrative record in certain limited situations. *Aero Corp., S.A. v. United States,* 38 Fed.Cl. 408, 411 (1997). Specifically, the court may consider "extra-record" evidence:

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997) (quoting *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989)). Here, the court permitted the parties to cite to extra-record evidence, specifically, the testimony at the hearing on the plaintiff's motion for temporary injunctive relief. *See* Transcript of February 24, 1999, hearing at 92–93. In arguing the instant motions for judgment on the administrative record, the parties have referred to that extra-record evidence, particularly to the hearing testimo-

ny of the Source Selection Authority, General Haines.

■ We decide this case on cross-motions for summary judgment on the administrative record by ITT, the government, and Northrop Grumman. Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1; *see Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir. 1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of Dept. of Health and Human Services,* 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *Jay,* 998 F.2d at 982. If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562–63 (Fed.Cir.1987). Alternatively, if the moving party can show there is an absence of evidence to support the non-moving party's case, then the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir. 1984).

The fact that all parties have moved for summary judgment does not relieve the

court of its responsibility to determine the appropriateness of summary disposition. *Prineville,* 859 F.2d at 911 (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)). Summary judgment will not necessarily be granted to one party or another simply because each has have moved for summary judgment. *Corman v. United States,* 26 Cl.Ct. 1011, 1014 (1992) (citing *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692–93 (4th Cir.1968)). A cross-motion is a party's claim that it alone is entitled to summary judgment. *A Olympic Forwarder, Inc. v. United States,* 33 Fed.Cl. 514, 518 (1995). It therefore does not follow that if one motion is rejected, the other is necessarily supported. *Id.* Rather, the court must evaluate each party's motion on its own merit and resolve all reasonable inferences against the party whose motion is under consideration. *Id.* (citing *Corman,* 26 Cl.Ct. at 1014). However, "[a] motion for summary judgment upon the administrative record, or for summary judgment, is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are matters of contractual and regulatory interpretation." *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 43 (1997).

## B. The September 30, 1998 Decision

In the decision issued on September 30, 1998, this court denied ITT's motion for a temporary restraining order and preliminary injunctive relief. *ITT Federal Services Corp.,* slip op. at 13. In its consideration of the likelihood of ITT's success on the merits of this protest, the court addressed four issues, namely, (1) the Air Force's evaluation of ITT's proposal in the area of Management/Technical, (2) the Air Force's evaluation of ITT's Past Performance, (3) whether the Air Force improperly used undisclosed evaluation criteria, and (4) whether the SSA's

decision comported with the solicitation criteria and the SSET's findings. *Id.* at 10.

1. Evaluation of the Management/Technical Factor

In the Management/Technical area, plaintiff urged that the SSET failed to consider properly its identified technical strengths because the SSET assigned blue ratings for factors three and five only in the Management/Technical area of its proposal. *Id.* The court, however, determined that plaintiff's complaint lacked merit. Pointing to the sworn hearing testimony of General Haines who "was effusive in his praise of plaintiff's Management/Technical abilities" and "referred to plaintiff as one of the Air Force's best contractors," the court concluded that the Air Force fully appreciated the technical strengths of the disappointed bidder. *Id.* The court determined that any error in this area of the agency's evaluation was harmless as the SSA's further testimony indicated that he would not have changed his award decision for Northrop even if ITT had received blue ratings on all seven Management/Technical factors. *Id.*

2. Evaluation of the Past Performance Factor

In the Past Performance area, plaintiff complained that the SSET did not consider the relevant past performance information it had submitted and improperly assigned two N/A (neutral ratings) to factors two and three. *Id.* The evidence showed that while ITT had pertinent past performance history, the SSET limited the number of blue ratings that could be applied to past performance factors.[18] *Id.* The evidence further showed that the SSA evaluated the plaintiff's proposal as though it had received four blue ratings for past performance.[19] *Id.* Thus, the court

---

18. By letter dated September 1, 1998, the Air Force responded to ITT's inquiry about its past performance ratings explaining:

The FAR is silent on procedures for assigning past performance information to a particular factor. The past performance information for all offerors was subject to the same procedures stated in the Proposal Analysis Report (PAR): "As the same information cannot be used to

rate more than one factor, past performance information for each contract was attributed to the highest factor."
Pl.'s App. at 109.

19. During the hearing on ITT's motion for preliminary injunctive relief, General Haines testified that, in his source selection decision, he "mentally" assigned a blue rating to ITT's proposal for each of the two Past Performance eval-

concluded that "if there was error in the SSET evaluation, it was corrected by [the SSA] in his evaluation reached prior to his decision." *Id.*

### 3. An Undisclosed Evaluation Factor

 Plaintiff further complained that, in contravention of procurement regulations, the Air Force failed to disclose one of the evaluation factors—specifically, Northrop's status as an Original Equipment Manufacturer ("OEM")—used in making the decision to award the CSCS contract to Northrop.[20] *Id.* ITT argued that the agency improperly considered Northrop's "capability to provide 'cradle to grave' and 'reach back' maintenance effort providing rapid response when design, test, and manufacturing expertise is needed." *Id.* The court, however, found no regulatory violation. *Id.* at 11. To obtain relief on its claim that the agency used undisclosed evaluation factors, ITT had to show that the government evaluated the submitted proposals on a significantly different basis than announced in the solicitation and that it was prejudiced as a result. *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 471 (1997) (citing *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 728 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988)). The court determined that the evidence did not support plaintiff's claim because the SSA testified that he evaluated Northrop's OEM status under Factor 7 (Maintenance Management) of the Management/Technical area. Sept. Tr. at 11. The court stated that "[i]t is not unreasonable to consider OEM status as intrinsic to Factor 7" and further observed that "Northrop gained no advantage over plaintiff in this factor [because] both [offerors] received 'green' ratings." *Id.*

### 4. The SSA's Decision

Plaintiff also challenged the soundness of the SSA's decision in light of the comment by the SSET in the PAR that "Northrop's prices appear to be reasonable with the exception of personnel security." *Id.* ITT contended that the agency accepted an unreasonably low bid in violation of the procurement regulations. But the court was unpersuaded. Satisfied that General Haines understood the price difference in security plans between Northrop and ITT after reviewing the PAR and the submitted proposals,[21] the court decided that the SSA was not arbitrary and capricious in concluding that "Northrop's price for its personnel security plan was not unreasonable." *Id.* at 12.

### C. The Instant Cross–Motions for Summary Judgment

In the summary judgment motion now before the court, ITT re-urges its earlier complaints, focusing more sharply on its allegations that: (1) the SSET did not properly evaluate its proposal, (2) Northrop submitted a non-compliant security plan, and (3) the SSA performed an improper cost/technical tradeoff. Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.") at 3–4.

### 1. The SSET's Evaluation

Again ITT argues that the SSET failed to properly score its proposal in the Management/Technical area. The disappointed offeror "maintains that there is a 'disconnect' between the number of strengths assigned to [its] proposal under the Management/Technical area and the [limited] number of blue ratings identified by Defendant for these same factors." Plaintiff's Motion for Summary Judgment ("Pl.'s Mot.") at 26. Plaintiff

---

uation factors to which the SSET assigned a neutral rating. Transcript of September 29, 1998 hearing ("Sept. Tr.") at 68; Pl.'s App. at 101.

**20.** The procurement regulations require that a solicitation include a clear statement of the factors and subfactors as well as the relative importance of the criteria that an agency will consider in evaluating submitted proposals. Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 15.203(a)(4) (1998); Competition in Contract-

ing Act ("CICA"), 10 U.S.C. § 2305(a)(2) (1998). However, those elements that are intrinsic to the stated factors or subfactors need not be identified. *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 44–45 (1997) (citing *Amtec Corp.,* 95–2 CPD ¶ 164 at 4 (1995)).

**21.** The SSET attributed the price difference to two items: the number of security personnel and the choice of security subcontractor. *ITT Federal Services,* slip op. at 12.

complains that the agency understated its technical superiority by failing to assign blue ratings for those factors in which the SSET had identified numerous strengths. *Id.* at 27–28.

The court, however, is unable to disturb the SSET's ratings of ITT's proposal. This court has stated that "[t]echnical ratings are aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess." *Hydro Eng'g, Inc.*, 37 Fed.Cl. at 467. Moreover, it is clear from the evidence in this case that the agency did not discount ITT's aptitude in the Management/Technical area, but acknowledged and considered its capability. The SSET identified nine strengths for Factor 6 (Quality Control) in the Management/Technical area of ITT's proposal, but stated that "they were not enough to drive the color [rating] above acceptable; therefore, the overall rating for this factor remains Green (Acceptable)." AR at 1536. The SSET noted ITT's strengths for Factor 6 (Quality Control) in a draft decision that it prepared recommending contract award to ITT.[22] Yet, the SSA testified that he would not have changed his award decision even if ITT had received all blue ratings in the Management/Technical area. Sept. Tr. at 53. Contrary to the plaintiff's assertions, the record amply documents the agency's awareness of the technical merit of ITT's proposal.

ITT further complains that the SSET did not give ITT proper credit in rating its past performance. Pl.'s Mot. at 28. Plaintiff advances the same argument it raised in the preliminary injunction hearing; and the view of the court on this issue is unchanged.

### 2. Northrop's Security Plan

In challenging Northrop's security plan, ITT focuses on the proposed personnel security staffing levels and Northrop's cost accounting for its security vehicles. *Id.* at 16–24.

#### a. Different Security Staffing Levels

ITT alleges that Northrop's offer failed to comply with the solicitation requirements for the provision of security staffing. *Id.* at 19. In particular, plaintiff asserts that the agency improperly permitted Northrop to propose reduced security staffing at the Marandua location without submitting a "new" threat assessment. Plaintiff's Consolidated Response to Defendant's and Intervenor's Motions for Summary Judgment ("Pl.'s Cons. Resp.") at 15. Pointing to the language in Section M of the solicitation which states that a "[s]ecurity plan shall include a current threat assessment and rationale justifying the level of personnel protection proposed for each location," AR at 90, ITT contends that Northrop was "obligated to provide a justification for the proposed reduction" in security staffing. Pl.'s Mot. at 22–23. ITT adds that by "simply mirror[ing] the threat assessment incorporated into Amendment 6," Northrop failed to comply with the solicitation requirements. Pl.'s Mot. at 23.

The wording of the contract, however, does not require the construction urged by ITT. As amended by Amendment 0006, the PWS does not require an offeror to use the exact RSO personnel plan in proposing personnel security for each site. AR at 306. Rather, paragraph 5.10.6 of the PWS states that "the contractor shall provide personnel protection security ... *considering* the applicable Embassy Regional Security Officer (RSO) endorsed security assessments and recommended personnel protection security levels provided in Technical Exhibit 12." *Id.* (emphasis added). Paragraph 5.10.6 adds that "[p]roposed security levels above or below the levels endorsed by the applicable RSO shall include a threat assessment and rationale justifying the level of security proposed." *Id.*

The Air Force argues that the threat assessment required by the PWS is the same as that required by the language in the solicitation to which plaintiff refers. *See* Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("D.'s Opp.") at 20; AR at 90. The Air Force further argues that the

---

**22.** The SSET stated that the strengths "demonstrate [ITT's] understanding of ISO 9001 require- ments and their commitment to quality." Pl.'s App. at 89.

solicitation requires an offeror to submit one threat assessment with its proposed security plan for each CSCS site. *Id.* The agency maintains that there is no requirement for a "new" or additional threat assessment if the offeror's proposal departs from the RSO's personnel plan. *Id.*

 The parties' contentions regarding whether the solicitation required an offeror to submit a "new" threat assessment with a proposed reduction in the security staffing level is an issue of contract interpretation appropriate for decision by this court. *See Fort Vancouver Plywood Co. v. United States,* 860 F.2d 409, 413–14 (Fed.Cir.1988). Basic contract construction principles require that when parties to a contract dispute the meaning of their agreement, the court must examine the contract language to determine whether it is ambiguous. *Id.* Contract language is ambiguous if it is susceptible to two different and reasonable interpretations, each of which is consistent with the language of the contract. *See Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993). When an ambiguity is found within a contract, the court must inquire whether that ambiguity is patent. *See Fort Vancouver,* 860 F.2d at 414.

██ "If a patent ambiguity is found in a contract, the contractor has a duty to inquire of the contracting officer the true meaning of the contact before submitting a bid." *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 650 (1982). *See also Fort Vancouver,* 860 F.2d at 414 (patent ambiguities are "so glaring as to raise a duty to inquire" by the contractor). Actual knowledge of the ambiguity by the contractor is not required. The test is whether the inconsistency is obvious. *See Chris Berg, Inc. v. United States,* 197 Ct.Cl. 503, 455 F.2d 1037, 1044–45 (1972); *see also Maintenance Eng'rs, Inc. v. United States,* 21 Cl.Ct. 553, 560 (1990) ("[a] contractor's failure to comprehend an obvious ambiguity in no way excuses its affirmative duty of inquiry").

██ The court must place an ambiguity in the contract along a spectrum of ambiguity. *See Fort Vancouver,* 860 F.2d at 414. Along the spectrum, "[t]here is a grey area

between the point … at which a document requires more exacting language and that at which additional detail will add nothing but worthless surplusage." *Id.* If a contract provision is patently ambiguous and an offeror fails to seek clarification, the provision is construed against the offeror. *See Aero Corp., S.A. v. United States,* 38 Fed.Cl. 739, 762 (1997). But if the ambiguity falls within the grey area of the spectrum, it cannot be patently ambiguous, and the language of the contract is construed against the drafter. *Id.* The court must then determine whether the contractor's interpretation was reasonable based on the language of the contract. *See Newsom,* 676 F.2d at 650.

 The solicitation in this case requires that an offeror submit a threat assessment with a proposed personnel security plan. That requirement is first set forth in Section M of the document, which states that a "[s]ecurity plan shall include a current threat assessment and rationale justifying the level of personnel protection security proposed for each location." AR at 90. The requirement is reiterated in PWS paragraph 5.10.6, as amended by Amendment 0006, which states that "[p]roposed security levels above or below the levels endorsed by the applicable RSO shall include a threat assessment and rationale justifying the level of security proposed." *Id.* at 306. Because the language in Section M is not obviously inconsistent with the language in the PWS, the court finds that any perceived ambiguity is not patent but falls within the grey area of the ambiguity spectrum, which requires the court to determine whether the agency's interpretation of the contract language was reasonable. *See Aero Corporation, S.A.,* 38 Fed.Cl. at 762; *Newsom,* 676 F.2d at 650. Reading the two contract provisions together, the court concludes that the Air Force's interpretation that an offeror must submit a single threat assessment with a proposed security plan whether or not the recommended staffing levels are included in the proposal is not an unreasonable contract construction.

The record in this case reflects that Northrop submitted the requisite threat assessment after considering the RSO's rec-

ommended plan and making a deliberate judgment regarding the security personnel needs at the Marandua site. The underlying rationale for Northrop's "dual hat" plan is the isolation of the location. *See* AR at 3291–92. Thus, contrary to plaintiff's assertion, Northrop has provided the required justification for its security staffing proposal.

Still, ITT complains that the Air Force improperly permitted Northrop to deviate from the recommended security staffing level for the Marandua site without offering other bidders an opportunity to "dual hat" their proposed security personnel. Pl.'s Mot. at 22. ITT cites a decision from the Office of the Comptroller General which states:

> It is a fundamental principle of federal procurement that offerors be treated equally; that is, offerors must be provided with a common basis for the preparation of proposals, and award based upon the requirements stated in the solicitation, unless the offerors are notified of changes in (or relaxation of) the agency's stated requirements.

*For Your Information, Inc.*, 97–2 CPD ¶ 164, 1997 WL 766862 at *3 (C.G.1997). ITT contends that the Air Force did not inform the other offerors of this "relaxation" in the security requirements and thus failed to treat all the offerors equally in contravention of federal procurement law. Pl.'s Mot. at 19.

Plaintiff, however, mischaracterizes Northrop's security staffing proposal as an improper deviation from the stated requirements. The PWS does not require adherence to the *recommended* staffing levels. *See* AR at 306. The mandatory language "shall" in PWS paragraph 5.10.6 applies only to the inclusion of a threat assessment and justifying rationale with a submitted security proposal, which may include staffing levels above or below the recommended levels. *Id.*

Moreover, the court observes that ITT's claim that the solicitation unambiguously required the recommended security staffing levels at Marandua is significantly compromised by evidence that it offered several proposals variously interpreting the recommended personnel security levels at Maran-

dua. The record shows that, prior to submitting its final proposal, ITT submitted a proposal to provide five security personnel for the Marandua site, three of whom would serve dual functions as security/bodyguards and as electronic monitoring specialists. *See* AR at 2291. ITT's arguments pertaining to Northrop's personnel protection security plan are unavailing. The court is satisfied that Northrop's proposed reduction in security staffing levels at the Marandua site met the solicitation requirements.

### b. Security Vehicle Cost Accounting

ITT further complains that the agency unfairly relaxed the contract's cost accounting requirements for Northrop. Pl.'s Mot. at 18. Specifically, ITT contends that the agency improperly permitted Northrop to omit the cost of its security vehicles from the personnel security CLIN. *Id.*

As amended by Amendment 0006, the PWS stated that any equipment, including security vehicles, associated with an offeror's security plan was not to become the property of the government. AR at 307. To clarify how to account for such equipment costs in a proposal, the CO faxed a letter to all of the offerors identifying which CLIN to use to price the security vehicles. *Id.* at 4248–49. But contrary to the direction of the CO, Northrop included the costs of its security vehicles in another CLIN as a cost to be depreciated.

Northrop asserts that its cost accounting treatment of the security vehicle costs complied with the solicitation. Intervenor's Supplemental Memorandum Regarding Cross Motions for Summary Judgment ("I.'s Supp. Mem.") at 5. Noting that PWS 5.10.6.2.2 required security vehicles to be provided to the government under a lease arrangement, AR at 307, Northrop explains that it treated the security vehicle costs [ ]. I.'s Supp. Mem. at 5. Northrop adds that the CO "did not require offerors to treat security vehicle costs [ ] nor did she prohibit them from including such costs outside CLIN 0X24 [ ]." *Id.* at 3.

The Air Force argues that the intent of the CO's letter "was to ensure that offerors placed the costs for security vehicles to a

firm fixed price Contract Line Item Number ("CLIN") so that they did not become the property of [the] Air Force at the completion of the CSCS contract." Defendant's Supplemental Briefing ("D.'s Supp. Br.") at 3. The Air Force adds that "upon receiving Northrop's bid in which Northrop placed the costs for security vehicles [ ], [the CO] Ms. Potter first consulted with an auditor and determined that Northrop's procurement of the vehicles was appropriate and then determined that because the [ ], Northrop's pricing scheme did not violate the terms of her June 22, 1998 letter." *Id.*

In addition, Northrop contends that "to the extent that more than one reasonable interpretation is apparent on the face of the Contracting Officer's letter, ITT was obligated to seek clarification of this ambiguity." I.'s Supp. Mem. at 5. Because ITT failed to seek clarification, Northrop argues, the contract provisions and the CO's letter regarding security vehicle pricing must be construed against plaintiff. *Id.* Northrop further asserts that ITT was not competitively harmed by its pricing approach as it similarly interpreted the CO's letter by pricing security vehicles outside CLIN 0X24. *Id.* at 4.

■ The court observes that while the intent of the CO's letter may have been merely to inform the offerors that security equipment was not to become government property, the language in the CO's letter, "the [security] vehicle(s) ... shall be included ... under the firm fixed price CLIN 0X24, Personnel Security" was mandatory. *See* FAR § 2.101 (defining "shall" as denoting the imperative). In deciding the legal effect of the CO's letter to the offerors regarding security vehicle pricing, the court considers the decision of the Comptroller General in *PHH Homequity Corporation*, B–237182, 1989 U.S. Comp. Gen. LEXIS 1508 (Oct. 31, 1989). In that case, the Comptroller General determined that a contracting officer's letter to all offerors communicating a pricing requirement of the solicitation contained "the essential elements of an amendment under the Federal Acquisition Regulation, (FAR) @ 15.606" even though the requirement was not issued in a formal

numbered amendment. *Id.* at *7–8. The Comptroller General decided that the information in the letter advising the offerors of the revised pricing requirements was binding on the contract bidders. *Id.* at *8. The court finds the reasoning underlying the Comptroller General's decision persuasive and equally applicable to the facts of this case.

Here, the CO's letter contained mandatory language specifically directing offerors to include the costs of security vehicles in CLIN 0X24. The letter effectively amended the terms of the solicitation. Northrop's proposal did not comply with the contract requirement, notwithstanding the CO's acceptance of Northrop's proposed pricing method.

■ However, the case law provides that only a "clear and prejudicial" error in the procurement process warrants relief. *Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995). While plaintiff has established a clear error in the procurement process because Northrop's proposal failed to comply with the solicitation requirement for security vehicle cost accounting, plaintiff cannot articulate how it would have responded differently to the solicitation if it had known that it might account for the costs of security vehicles in the same manner utilized by Northrop. Transcript of July 16, 1999 hearing ("July Tr.") at 50. Indeed, plaintiff has failed completely to demonstrate the element of prejudice. *See Candle Corp.*, 40 Fed.Cl. at 665. Nor is the court persuaded that the differential treatment "made a difference" in the larger award process.

Plaintiff asserts that the disparate accounting for security vehicle costs exaggerated the costs savings attributed to Northrop's proposal. Pl.'s Mot. at 18. That assertion is simply wrong. The overall cost savings would remain the same notwithstanding the accounting. What would change in Northrop's proposal is the amount of savings attributable to security costs—which would decrease from [ ]. After charging that Northrop has understated its personnel security costs, ITT also complains that Northrop's price for personnel security was "unreasonably low." *Id.* This charge appears to rely for support on a statement by the SSET in

its Proposal Analysis Report ("PAR") that "[o]verall, Northrop's prices appear to be reasonable with the exception of personnel security. Northrop's price for security appears to be low...." AR at 1543. The observation that Northrop's price for security is low does not support the conclusion that the price is "unreasonably low." And it is clear that Northrop's security costs were, if anything, understated in its proposal. Plaintiff's objection is, finally, that because of the CO's error in allowing Northrop to account for security vehicles in CLIN 0X24, the "true price of security is not reflected in [Northrop's] bid where it should be ... when the SSA is called upon to make his decision, he doesn't have the benefit of that understanding." July Tr. at 54. The court does not find that the possible lack of "understanding" of an accounting point constitutes the type of "significant, prejudicial error in the procurement process," *Alfa Laval Separation, Inc. v. United States,* 175 F.3d at 1367, that requires the court to set aside this procurement.[23]

### 3. The Award Decision

The core of ITT's criticism of the award decision is that the SSA conducted an improper cost/technical tradeoff by affording improper weight to the price factor in the cost/technical tradeoff. Plaintiff complains that, by focusing on the price differential between plaintiff's and Northrop's proposals, the SSA disregarded the source selection criteria outlined in the solicitation which specifically stated that the areas of "Management/Technical and Past Performance are each more important than price." AR at 90. Noting that its proposal was indisputably technically superior to Northrop's, ITT alleges that the SSA improperly evaluated the proposal on a "low cost, technically acceptable" basis rather than the prescribed "best value" standard. Plaintiff cites *PharmChem Lab., Inc.,* 91–2 CPD ¶ 317, 1991 WL 216281 at *3 (C.G.1991), in which the Comptroller

General opined that "it is improper to induce an offer representing the highest quality and then reject it in favor of a materially inferior offer on the basis of a relatively insignificant price difference." We agree with the general proposition; however, we disagree with plaintiff's contention that such an impropriety occurred in this case.

We begin with the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 15.101 (1998), which provides:

> An agency can obtain best value in negotiated acquisitions by using any one or a combination of source selection approaches. In different types of acquisitions, the relative importance of cost or price may vary.

FAR § 15.101. That regulation further provides:

> [I]n acquisitions where the requirement is clearly definable and the risk of unsuccessful contract performance is minimal, cost or price may play a dominant role in source selection. The less definitive the requirement, the more development work required, or the greater the performance risk, the more technical or past performance considerations may play a dominant role in source selection.

*Id.* The procurement regulations also provide that "[a] tradeoff process is appropriate when it may be in the best interest of the Government to consider [an] award to other than the lowest priced offeror or other than the highest technically rated offeror." *Id.* at § 15.101–1(a). In a source selection decision, the SSA must document the rationale for a tradeoff but need not quantify it. *Id.* at § 15.308.

In reviewing a government procurement, the court should defer to an agency decision that is "grounded in reason" even if the court itself might have chosen a different bidder. *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996) (citing *Widnall v. B3H,* 75 F.3d 1577, 1580 (Fed.Cir.

---

**23.** Plaintiff further speculated during oral argument that Northrop might charge the government additional [ ] of its proposal. July Tr. at 55. We are not aware of any basis for setting aside the procurement based on such a speculation. *See* I.'s Supp. Mem. at 6 (stating that the entire amount of security vehicle costs to be charged to the government under the CSCS contract are reflected in the [ ] of Northrop's proposal and the costs to armor the security vehicles included in [ ]).

1996)). "Procurement officials have substantial discretion to determine which proposal represents the best value for the government." *Id.*

The three evaluation criteria in this procurement were Management/Technical, Past Performance, and Price. AR at 90. Although of lesser importance than the other evaluation criteria, price remained a substantial factor in evaluating overall value to the government.[24] *Id.* Comparing the bids of ITT and Northrop for the CSCS contract, the SSA, General Haines, noted that ITT's proposal was exceptional and that Northrop's satisfied the solicitation's evaluation standards. AR at 1551. Giving consideration to the relative order of importance of the evaluation criteria, General Haines task was to assess the value of ITT's higher priced, "superior" proposal as compared to Northrop's lower priced, "solid" proposal. *Id.* In a handwritten note to the CO and the SSET Chair dated August 15, 1998, which appears to have served as a transmittal to the SSET of his source selection decision, the SSA states:

> I could not find significant diference [sic] except ITT's experience in running sites under the current contract. While this is a significant benefit, [i]t is not sufficient to overcome the cost delta in the two proposals.

*Id.* at 1620.

Plaintiff has argued that General Haines' note indicates that he failed to appreciate the technical superiority of ITT's proposal and did not conduct a technical/cost tradeoff as contemplated by the source selection document. *See* July Tr. at 18–20. However, contrary to plaintiff's assertions that General Haines did not appreciate the superiority of its proposal, the record indicates that General Haines understood that ITT was a "blue" contractor. *See* AR at 1551; Sept. Tr. at 20. The subject of ITT's technical strength was a major focus of the September hearing on plaintiff's motion for a temporary restraining order and preliminary injunctive relief. *See* Sept. Tr. at 68. The record contains several

draft decisions, prepared in the decision making process, which would have awarded the CSCS contract to ITT. AR at 7536–41. In the court's view, it may be possible to interpret the record as showing that the SSA, General Haines, failed to evaluate the submitted proposals in accordance with the criteria set forth in the solicitation; but the record does not compel or require that interpretation.

A review of the SSA's written decision and his hearing testimony shows that the SSA considered the SSET's evaluations and noted that the technical weakness of Northrop's proposal would impose a burden on the government. The SSA nevertheless determined that the burden was "substantially" outweighed by the cost savings. Although the solicitation placed greater weight on the Management/Technical and Past Performance aspects of the submitted proposals, General Haines understood that it did not ignore cost considerations. The court finds that the SSA performed a technical/cost tradeoff and documented the rationale for the tradeoff as required by FAR § 15.308. The SSA exercised his judgment regarding the "best value" to the government. AR at 1550–52. The court declines to substitute its judgment for the judgment of the agency's procurement official.

 Plaintiff has further argued that the SSA erred in awarding the contract to Northrop because the proposals had to be technically equivalent before price became determinative. Pl.'s Mot. at 12. However, the language of the solicitation does not require strict technical equivalence before price may properly be considered. Rather, it establishes a continuum from which the best value to the government may be selected, stating:

> The greater the equality of the proposals, the more important price and other price factors become in selecting the best value.

---

24. The acquisition regulations require that price or cost to the Government shall be evaluated in every source selection. FAR § 15.304(c)(1).

AR at 89. Applying the rules of contract interpretation which require contract provisions to be construed to effectuate the spirit and purpose of the contract and to give meaning to all of its parts, *Northrop Grumman Corp. v. Goldin,* 136 F.3d 1479, 1483 (Fed.Cir.1998), the court interprets this excerpted contract language to provide a measure of latitude in the "best value" determination, permitting some price consideration with technically unequal proposals. This interpretation is also consistent with the procurement regulations which permit the SSA to exercise discretion in awarding a contract to "other than the highest technically rated offeror," FAR § 15.101–1(a), and require consideration of price in every procurement. FAR § 15.304(c)(1).

■ Generally, the case law provides that a contract award may not be upheld when the SSA improperly departs from stated evaluation criteria in a solicitation. *See Latecoere Int'l., Inc., et al. v. United States,* 19 F.3d 1342, 1350 n. 6 (11th Cir.1994) (court determined award to offeror other than exceptionally rated offeror improper based on evidence of bias and manipulation to increase awardee's ratings in critical areas from marginal to acceptable); *MCR Federal, Inc.,* B–280969, 1998 WL 953965 at *5 (C.G.1998) (SSA improperly selected offeror with lower technical rating where record, in best value procurement, devoid of documentation showing that proposals were technically comparable or alternatively, that award to higher rated proposal not worth the cost premium); *PharmChem Lab., Inc.,* 91–2 CPD ¶ 317, 1991 WL 216281 at *5 (C.G.1991) (SSA improperly departed from stated evaluation criteria by discounting the apparent technical advantage of an offeror in favor of the relatively small price advantage—specifically a cost delta of approximately $82,500 or 1.6% between $5M dollar proposals—of another offeror without explanation). In its citations of persuasive but non-binding authority to the court, plaintiff has placed particular emphasis on the decision of the Comptroller General in *Dewberry & Davis,* 92–1 CPD ¶ 421, 1992 WL 103406, at *4 (C.G.1992). In

that case, the Comptroller General sustained a protest where the SSA's award decision was inconsistent with the RFP's evaluation scheme, which identified price as a secondary consideration to technical merit. The Comptroller General concluded that the SSA's statement "that the government's *minimal needs* in this situation can be met by [a particular offeror] at a substantially lower cost than the services proposed by [another offeror]" evidenced an improper cost focus rather than a technical emphasis in reaching the award decision. *Id.* at *3 (emphasis added).

■ The facts of this case, however, are distinguishable from the cited cases. Here, there is no evidence of bias or manipulation to improve unfairly the ratings assigned to Northrop's proposal. Nor was the price difference between the submitted proposals for the CSCS contract insubstantial. Nor, as in *Dewberry & Davis,* was Northrop's proposal regarded as satisfying only "minimal needs." Rather, Northrop's proposal was viewed as "solid" and as presenting low risk in performance. AR at 1551. Here, the source selection decision reflects a cost/technical tradeoff decision in which the SSA reasonably determined that the cost savings of $4.5 million dollars or 8.4% in selecting Northrop was not offset by the superior characteristics of ITT's Management/Technical proposal. *See id.* at 1551. Because neither the evidence nor the authorities compel a different conclusion, the court decides that General Haines did not exceed the latitude permitted under the law in exercising his discretion to award this contract. *See Keco Indus., Inc.,* 203 Ct.Cl. at 574, 492 F.2d 1200; *Baird Corp.,* 1 Cl.Ct. at 664.

III. Conclusion

Accordingly, based on the foregoing, it is ORDERED as follows:

1. Plaintiff's Motion for Summary Judgment is DENIED. Defendant's and Intervenor's Motions for Summary Judgment are GRANTED. The Clerk of the Court shall enter judgment for Defendant and Intervenor.

2. On or before Friday, October 8, 1999, the parties shall file requests for deletion of protected/privileged material from the published opinion to be issued by the court.

3. Each party shall bear its own costs.

IT IS SO ORDERED.